SYSTEMS OPERATIONS, INC., a Delaware Corporation, and Mathematica, Inc., a New Jersey Corporation, Plaintiffs,

v.

SCIENTIFIC GAMES DEVELOPMENT CORPORATION, a Michigan Corporation, and Dittler Brothers, Inc., a Georgia Corporation, Defendants.

Civ. A. No. 76–250.

United States District Court,
D. New Jersey.

March 23, 1976.

Clarification and Modification of Court's Order May 24, 1976.

Miller & Porter by William Miller, Allen D. Porter, Princeton, N. J., Millman & Jacobs by Morton C. Jacobs, Max R. Millman, Philadelphia, Pa., for plaintiffs.

Powell, Goldstein, Frazer & Murphy by C. B. Rogers, Harvey D. Harkness, Atlanta, Ga., for defendant Dittler Bros., Inc.

Jones, Thomas & Askew by Anthony B. Askew, Atlanta, Ga., for defendant Dittler Bros., Inc.

Troutman, Sanders, Lockerman & Ashmore by Michael C. Murphy, Robert L. Mote, Atlanta, Ga., for defendant Scientific Games Development Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CLARKSON S. FISHER, District Judge.

Plaintiffs come before this Court seeking a preliminary injunction to restrain the defendants from disparaging plaintiffs' product and interfering with a contractual relationship. This is one aspect of a three part complaint alleging violations of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq. and the Clayton Act, 15 U.S.C. § 12 et seq., and requesting a declaratory judgment as to validity of certain patents asserted by one of the defendants. 35 U.S.C. § 1 et seq.; 28 U.S.C. § 2201, § 2202. Subject-matter jurisdiction is established under 28 U.S.C. § 1337 and § 1338. This Court has pendent jurisdiction over the disparagement and contractual interference allegations.

This Court hesitates to call this matter "the lottery case," for fear that it might in some small way be confused with *The Lottery Case*, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) of "commerce clause" fame. Nevertheless this case does involve lottery tickets—of the instant winner variety [1]—which some states have implemented for revenue raising purposes.

Plaintiffs, Systems Operations, Inc. [hereinafter referred to as S.O.I.], a Delaware corporation with its principal place of business in New Jersey, and Mathematica, Inc.,[2] a New Jersey corporation with its principal place of business in New Jersey, are lottery consulting firms responsible for the implementation, marketing and design of various types of public lotteries. Defendant, Scientific Games Development Corporation [hereinafter referred to as Scientific Games], is a Michigan corporation with its principal place of business in Atlanta, Georgia and furnishes consulting services in the implementation, marketing and design of lotteries, particularly instant lotteries. Defendant, Dittler Brothers, Inc., is a Georgia corporation with its principal place of business in Atlanta and is involved in printing, among other things, instant lottery tickets. Scientific Games markets the instant tickets produced by Dittler Brothers. Before proceeding to the merits of plaintiffs' claim for preliminary injunctive relief and the facts surrounding that claim, this Court will examine the issues raised by defendant, Dittler Brothers, as to personal jurisdiction and venue.[3]

---

1. In instant lotteries, a predetermined number or group of winning numbers is printed on the lottery ticket and concealed with some form of removable coating or covering. The purchaser of the ticket can determine instantly whether he purchased a winning ticket by removing the concealment medium in a prescribed manner—usually by scraping with a coin. Plaintiffs' Complaint Paragraph 10.

2. S.O.I. is a 76% owned subsidiary of Mathematica. Plaintiffs' Complaint Paragraph 5.

3. There are no such issues as to defendant, Scientific Games.

# I

## PERSONAL JURISDICTION AND VENUE

 Defendant, Dittler Brothers, asserted at the outset of the hearings on this matter that this Court had no personal jurisdiction over it and that venue was improper. In its proposed findings of fact and conclusions of law, however, Dittler stated that it would not contest the propriety of venue and jurisdiction as to it for purposes of this motion for preliminary relief. Defendant will file appropriate Rule 12 motions later. It should be noted, however, that Dittler, at this juncture, expressly leaves plaintiffs to demonstrate, for purposes of preliminary injunctive relief, that they are likely to prevail on the issues of venue and jurisdiction when the action is tried on the merits. *Industrial Electronics Corp. v. Cline,* 330 F.2d 480, 481 (3rd Cir. 1964). To this point the Court now turns its attention.

Dittler Brothers is a Georgia corporation with its principal place of business in Atlanta. It is an extensive printing concern producing such items as timetables for major airlines and Amtrak, rotary cigar bands and, of course, instant lottery tickets. It has no registered agent in New Jersey, and no accounts with New Jersey corporations. A Dittler salesman in New York City periodically comes into New Jersey to solicit business, but, as just noted, Dittler Brothers presently has no New Jersey accounts. On the other hand, the president of Dittler Brothers, Gilbert Bachman, visited the New Jersey Lottery Director with Dr. John Koza, chairman of the board of directors for Scientific Games. Mr. Bachman accompanied Dr. Koza as his "production consultant" when he was attempting to sell instant tickets to the State of New Jersey. Mr. Bachman would answer questions concerning the techniques of ticket production. Scientific Games subsequently obtained the instant lottery contract with New Jersey. Dittler Brothers, who manufactures the New Jersey instant lottery ticket, argues that its contract is with Scientific Games, and the tickets are sold directly to it. Yet it was admitted that Dittler employees physically load their trucks with New Jersey lottery tickets and ship them to Trenton. The June, 1975 order was for 50 million tickets and called for delivery F.O.B. Atlanta. The September order was for 50–60 million tickets and called for delivery F.O.B. Trenton. While there was no testimony on precisely how much money was involved in these transactions for Dittler or Scientific Games, it was clear throughout the hearings that the amount was substantial.

15 U.S.C. § 22 states:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transact business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

This statute ". . . deals with both venue and personal jurisdiction, in antitrust actions against corporations . . ." *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1961). The critical determination for this Court is whether Dittler Brothers can be said to transact business in New Jersey.[4] Since venue and jurisdiction under the above statute are to be viewed as congruent, *Pacific Tobacco Corp. v. American Tobacco Co.,* 338 F.Supp. 842 (D.Or.1972), if Dittler can be said to transact business in New Jersey, then venue is appropriate in this jurisdiction and service is authorized. *Call Carl, Inc. v. B P Oil Corp.,* 391 F.Supp. 367, 370 (D.Md.1975).

In resolving this issue, the predomination of one factor over another is not determinative, but rather the total of relevant activities considered in light of the circumstances of this case. Moreover, the term "transact

---

4. Service of process was accepted by the attorneys for the defendants after the signing of an Order to Show Cause in this matter.

business" is to be given its ordinary and usual meaning. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 373, 47 S.Ct. 400, 403, 71 L.Ed. 684, 689 (1927).

> "The mere fact that . . . [the] defendant is [not] registered to do business in [New Jersey], nor maintains any offices, telephones, [etc.], . . . is not dispositive, per se, of the issue whether [it] did, in fact, transact business here in the usual sense."

*School District of Philadelphia v. Harper & Row Publishers, Inc.,* 267 F.Supp. 1006, 1009 (E.D.Pa.1967).

> "The practical, *everyday business or commercial concept* of doing or carrying on business 'of a *substantial character*' . . . [is] the test of venue." (emphasis added).

*United States v. Scophony Corp.,* 333 U.S. 795, 807, 68 S.Ct. 855, 862, 92 L.Ed. 1091, 1100 (1948).

Considering the facts in the instant case and the concepts outlined above, the case most on point with the instant situation is *Sunbury Wire Rope Mfg. Co. v. United States Steel,* 129 F.Supp. 425 (E.D.Pa.1955). In that case the court evaluated the defendant's sales activities in the district, to determine whether it was "transacting business" within the meaning of 15 U.S.C. § 22.[5] The defendant had negotiated a contract outside the district which required substantial sales within the district. In analyzing the case before him, Judge Grim noted:

> "[t]here can be a substitute for every department of a business but sales. Products or parts of them can be bought instead of manufactured, but there can be no substitute for sales. Without sales no business can exist. A sale is never complete until delivery is made, since it is the delivery which entitles the manufacturer to money and it is the earning of money which is the real purpose of business."

*Id.,* at 427. The defendant argued that the $600,000 worth of steel delivered was but a small portion of its overall business and was, therefore, not sufficiently substantial.

In rejecting this argument, the court stated:

> "[w]hether or not a defendant is 'transacting' business in a particular district should not and does not depend on whether or not a defendant corporation or its overall sales are large or small. *The important thing is whether or not the sales would appear to be substantial from the average businessman's point of view.*" (emphasis added).

*Id.*

As was noted earlier, discussions of precise dollar figures relating to various lottery contracts were carefully avoided by both parties. Nevertheless it was never disputed that ticket sales to New Jersey involve a substantial amount of money and the delivery of over 100,000,000 instant tickets. It would be difficult to find, therefore, that such sales are not substantial. As for the F.O.B. aspect of the transactions, the court in *Sunbury Wire* made it clear on defendant's reargument that ". . . the term 'delivery' was not used in any technical sense, but was used in its 'practical, everyday business or commercial concept.'" *Id.* at 427, 428. Thus the fact that deliveries were F.O.B. Detroit in that case did not control. See also *B. J. Semel Associates, Inc. v. United Fireworks Mfg. Co.,* 122 U.S. App.D.C. 402, 355 F.2d 827 (1965). On the basis of the foregoing, this Court concludes that plaintiffs have more than adequately established a probability of success upon the issues of venue and jurisdiction when this action is tried on the merits. *Industrial Electronics Corp., supra.* It is difficult to see how Dittler could not be said to "transact business" in New Jersey under 15 U.S.C. § 22 in light of its sales activities in this State. If this view is sustained upon a trial on the merits, this Court will have personal jurisdiction over Dittler insofar as the antitrust aspects of this case are concerned. It is important to note, however, that transacting business for the purposes of 15 U.S.C. § 22 and the conclusions reached from an analysis of same do not resolve

---

5. The activities considered were not directly related to the cause of action or to the plaintiff.

personal jurisdiction questions for the remaining claims. A separate and distinct inquiry into state law requirements is necessary on this point. See *Call Carl, Inc.,* *supra* at 377.

New Jersey's long-arm jurisdiction is broadly defined as that which is "consistent with due process of law." New Jersey Court Rules, R. 4:4–4(c)(1) (1969). Further guidance must be found in the case law. Initially it should be noted that:

"... the fact alone that the cause of action maintained did not arise out of defendant's sales activities in New Jersey is not *per se* a sufficient basis to deny the assertion of jurisdiction."

*Corporate Dev. Spec., Inc. v. Warren-Teed Pharm., Inc.,* 102 N.J.Super. 143, 150, 245 A.2d 517, 521 (A.D.1968). In *Litton Ind. Systems v. Kennedy Van Saun Corp.,* 117 N.J.Super. 52, 283 A.2d 551 (L.D.1971) the court said:

"Where ... the causes of action has been unrelated to the business activities carried on within the State, the jurisdictional basis required has gone beyond the mere 'minimum contacts' test. In such a situation it has been held that before subjection to jurisdiction can be seen as 'reasonable,' defendant's activities in the State must be both 'continuous' and 'substantial.' In a word, local contacts must be greater where the cause of action is unrelated. *Corporate Dev. Spec., Inc. v. Warren-Teed Pharm., Inc., supra; Arrowsmith v. United Press International,* 320 F.2d 219, 6 A.L.R.3d 1072 (2 Cir. 1963). ...

This concept of 'substantiality' is a relative one. It really means *sufficient* substantiality (with continuity) of the forum business to make it reasonable to exert jurisdiction as against the countering influence of nonrelation of the cause of action."

*Id.* 102 N.J.Super. at 58, 59, 283 A.2d at 554. A similar analysis is suggested by the Restatement of Law, 2d, Conflict of Laws (1967 Proposed Official Draft) § 47 relied upon by the court in *Corporate Dev. Spec. Inc., supra.* In that case, $100,000 or 1.4% of the defendant's national gross were New Jersey sales, and New Jersey was acknowledged to be an integral segment of the defendant's business. The court strongly suggested such activity was substantial enough to make it reasonable to assert jurisdiction over it. *Corporate Dev. Spec. Inc., supra,* 102 N.J.Super. at 152, 283 A.2d 551. See also, *Amercoat Corp. v. Reagent Chem. & Research Inc.,* 108 N.J.Super. 331, 261 A.2d 380 (A.D.1970); *but compare Deloro Smelting & R. Co. v. Engelhard Minerals & Chem. Corp.,* 313 F.Supp. 470 (D.N.J.1970).

In view of the guidelines set out above, it is apparent to this Court that plaintiffs have shown a reasonable probability of being able to establish that the business activities of the defendant, Dittler Brothers, in this State are substantial, and that it is fair and reasonable for this Court to exercise jurisdiction over said defendant. New Jersey's instant lottery game is an important part of Dittler's business in the lottery field and becomes more significant to it as the number of states desiring to utilize the instant lottery for revenue increases. The substantial and successful sale of Dittler's tickets in this State will greatly support its efforts in these states. In addition, it is difficult to view the delivery of 50–100 million tickets into this State as anything but substantial. Nor is the solicitation/consultation visit to this State by Dittler's officer to be ignored. While at this time the Court lacks specific dollar and sales percentage figures for Dittler Brothers, and this and similar information will be helpful in finally resolving the issue, the Court finds that plaintiffs have established a reasonable probability of success upon the remaining jurisdictional issue when the action is tried on the merits. *Industrial Electronics Corp., supra* at 482.

## II

## PRELIMINARY INJUNCTION

Before plaintiffs are entitled to a preliminary injunction they must show (1) a reasonable probability of eventual success when the action is tried on the merits and

(2) that they will be irreparably injured *pendente lite* if relief is not granted. In addition this Court must consider the possibility of harm to other persons from the grant or denial of injunctive relief, as well as the public interest. *Oburn v. Shapp*, 521 F.2d 142, 147 (3rd Cir. 1975). After signing an Order to Show Cause, this Court held three full days of in camera hearings on plaintiffs' request for preliminary relief. From these hearings, this Court found the following facts.

## A

## FINDINGS OF FACT

At the outset, the Court wishes to explain certain terminology used during the hearings and in this opinion. The term "broken" in the field of instant lottery tickets has several meanings depending upon the context in which it is used. "Any way in which an instant ticket can be read, without removing [or disturbing] the cover from the spots, so as to determine whether or not it's a winner or a loser . . . would [be] a broken ticket." T.—I, p. 145. To this extent, it has been suggested that any ticket could be broken given the time, money and equipment. Another more relevant use of the term involves activity by ticket selling agents, possibly customers or anyone who comes in contact with a fairly substantial number of tickets before they are scraped. To the extent that these individuals might "break" the tickets, as described above, serious questions of ticket security arise. To effectively "break" a ticket in this context would necessitate a fast moving and relatively inexpensive system to make "breaking" profitable.[6] (It must be remembered that at least the losing tickets, but actually all of the tickets must remain salable after determining what is underneath the spots or the ticket cannot be said to be truly "broken.") Thus ". . . knowing exactly how it's done, how long it takes or whatever the system is [i. e. equipment, etc.], and whether it's feasible or not for an agent or for a customer or anybody to do this [profitably] on a mass basis . . ." is critical in determining whether an instant ticket is *insecure* or "broken" in the latter context. T.—I, p. 192.

In May of 1975 plaintiff S.O.I. and the City Betterment Corporation of Omaha, Nebraska entered into a consulting contract under which plaintiff would provide consulting services for the running of a city lottery. On October 10, 1975 the President of City Betterment Corporation authorized S.O.I. to proceed with the implementation of an instant lottery game for the city. This game was to begin in early December of that year. On October 30, 1975 the Director of the Omaha lottery, Sam Schwartzkoph, received a telephone call from a Dr. Koza, the chairman of the board of directors for Scientific Games. Dr. Koza, in Schwartzkoph's words, was "very outspoken about the security of [plaintiffs'] tickets." T.—I, p. 46. He stated the security could be broken on the tickets, apparently referring to the Omaha ticket. Dr. Koza further stated that the New Jersey State Police had broken the ticket's security, and that Scientific Games had taken the Michigan instant lottery contract away from plaintiffs because their tickets were insecure. Omaha tickets did not go into production until mid-November, 1975. Dr. Koza requested that he be sent some tickets—a request Schwartzkoph chose not to fulfill.

One month later, Schwartzkoph invited Dr. Koza to Omaha to *discuss instant games.* On December 10th, with the game already in progress, two representatives from Scientific Games, Bower and Wallace arrived in Omaha.[7] These representatives

6. It would appear that the system would have to be inexpensive since there may be, for example, a big winner, $10,000 or $1,000, in every 100,000 or 33,000 tickets respectively. A ticket agent would normally have from a few hundred to several thousand tickets at most. In addition, although an effective system might successfully recover several smaller prizes, to be profitable it would appear that this system would also have to be inexpensive. Expense can usually be equated with necessary equipment in this situation.

7. During the first week of sales, December 1 through December 5, the son of representative Wallace purchased $2,000.00 worth of Omaha

met with the lottery director and other lottery officials. At a meeting with Schwartzkoph and in subsequent conversations with other Omaha lottery officials, Wallace suggested that the Omaha ticket was insecure, and that "a twelve year old child could break it." T.—I, p. 51, 77. Bower suggested to Schwartzkoph that the tickets were possibly insecure. It should be noted that at no time did Dr. Koza, Wallace or Bower ever explain in any way how the Omaha ticket could be broken or any basis for their claim of insecurity, despite repeated requests by lottery officials.[8] From the testimony and investigations of several witnesses and in response to questions by the Court, it is clear that the Omaha instant lottery functioned as expected with no indication that ticket security had been broken.[9]

In September of 1975 plaintiff, Mathematica, was retained under contract by the state of Delaware as its lottery consultant, and by letter dated November 19, 1975 was authorized to develop and implement an instant lottery game. On January 8, 1976 a meeting, initiated by Scientific Games representative Bower, was held in Delaware between Bower and Peter Simmons, Acting Director of the Delaware State Lottery Commission. The purpose of the meeting, according to Simmons, "was to *discuss a game*," T. I, p. 159 (emphasis added); Bower being given the distinct impression by Simmons that Delaware had not yet decided to run an instant lottery, or who might produce the instant tickets.

During the January 8th meeting, Bower told Simmons that the plaintiffs' Omaha ticket was insecure and could be broken. They discussed a couple of ways the ticket might be broken which included a method of forging the revealed numbers and a method by which the surface could be wiped to reveal numbers. Bower alleged that the latter method could be done, and the ticket would remain salable to the general public. Neither Simmons nor Bower had Omaha tickets in their immediate possession during the meeting. Bower also told Simmons that ticket selling agents were ". . . ripping off Omaha . . . by looking at the tickets, determining whether or not they were winning tickets through [the above described method] . . . ." T—I., p. 120, 121. See also T. I, p. 169. It should be noted that the Delaware and Omaha tickets are not the same.

Simmons immediately put a hold on plaintiffs' Delaware ticket production to investigate whether the statements regarding the Omaha ticket were true, and whether these statements applied to the Delaware ticket. Simmons already had a report from the Superintendent of the Delaware State Police which indicated that all security tests on the plaintiffs' tickets proved negative, but Simmons was interested in the "latest word." After discussing the matter thoroughly with Max Goldman, the President of S.O.I./Mathematica, and receiving assurances that the Delaware tickets were secure; and after investigation revealed that the Omaha lottery was running smoothly, Simmons ordered Delaware instant ticket production resumed.

On January 19th Bower called Simmons and informed him that he had some instant tickets with a Delaware label on them, and that he felt they were unsound, insecure tickets [10]. When asked in what way they were insecure, Bower responded that he only had a few tickets and had not done any heavy testing, but that the problems were

---

instant lottery tickets. So far as can be determined, this was the first time the defendant, Scientific Games, had seen the Omaha ticket.

**8.** Schwartzkoph was told that such an explanation would reveal trade secrets that would help their competitors. The brief explanation that Schwartzkoph was given related to being able to pick the third number after two had been revealed. It is obvious that such a ticket was not "broken."

**9.** Bower attempted to "break" an Omaha ticket while a witness at the hearings. This attempt failed. For a discussion of "breaking" a ticket, see discussion, *supra*, p. 755.

**10.** Scientific Games had obtained a few of what were apparently sample tickets produced by the plaintiffs. The source of these tickets was someone within the Ohio lottery commission.

similar to the problems that existed with the Omaha tickets (i. e., reading numbers through the coating). Being concerned with the security of plaintiffs' tickets, Simmons sent Bower more Delaware tickets on January 27, 1976, and *requested* he be advised of his 'findings as soon as possible. Exh. DS–3.

On January 29th, Simmons received a carbon copy of a letter sent to Max Goldman which advised the latter that plaintiffs' ticket was infringing upon certain patents. The letter was from a patent attorney representing defendant, Dittler Brothers[11]. Simmons contacted Goldman who, unaccountably, had not yet received the letter. Apparently Delaware then received some reassurances from the plaintiffs regarding indemnification.

With the Delaware instant tickets scheduled to go on sale on February 10th, Bower met Simmons in Dover on the 2nd to discuss the initial results of his investigations. Bower related numbers which he believed to be under the covered spots on the tickets supplied by Simmons. Simmons declined to scrape off the coating, deciding to take the matter up with Mathematica. While Bower was able to predict approximately 65 of 66 numbers on 13 tickets submitted to him by Simmons, Simmons testified that only some of the tickets remained salable. Apparently most of these tickets were "noticeably changed" and could not be considered to have been "broken." (*cf.* T.—I, p. 150, 165). *Moreover, when asked how it was done, Bower refused to explain, except to say that it was easy and did not take long. Simmons placed another "hold" on plaintiffs' production.*

On February 5th Simmons met again with Bower and also with Gilbert Bachman, President of Dittler Brothers. Both gentlemen informed Simmons that they could have a Delaware instant lottery game in three to four weeks if he should place an order with Scientific Games. On the same date, Simmons lifted the "hold" on Delaware ticket production.

It must be noted that this Court also finds the instant lottery industry to be a growing field with rapidly expanding markets. The sizable contracts with certain states are not permanent, and competitive bidding is often involved when a contract is to be awarded. Moreover there are presently a mere handful of states now actively engaged in or pursuing instant lottery games, but the national market is potentially enormous. Two contracts were up for bids during the course of the hearings in this matter. In short, these parties are almost constantly negotiating or bidding on contracts or urging other states to enter the market. In light of all the foregoing discussion, the Court now examines the law.

## B

### CONCLUSIONS OF LAW

The plaintiffs' complaint alleges disparagement of their product by the defendant. Unfortunately, disparagement, sometimes called "trade libel" as well, is not a clearly defined tort.[12]

"Because of the unfortunate association with 'slander,' a supposed analogy to defamation has hung over the tort like a fog, concealing its real character, and has had great influence on its development."

W. Prosser, *Law of Torts* 916 (4th ed. 1971). "Trade libel" is concerned with interests in property and should be called "disparagement" to avoid confusion with defamation (libel and slander) which concerns interests of personality. This approach should make it clear:

11. The letter stated that Dittler was the exclusive licensee of three patents, and that after examination counsel was of the opinion that the Delaware instant ticket infringes on "one or more" of the patents. It further requested that Mathematica/S.O.I. cease all infringing activity. Dittler's president had given his patent attorney sample tickets for evaluation with authorization to file suit to protect the patents if necessary.

12. This Court could find no significant legal differences among the states in the area of disparagement. This is truly a developing area of the law and my references are general, guided only in part by New Jersey and Third Circuit authorities.

". . . that the action for disparagement of property has a place of its own in the law; and is not a mere branch, or special variety, of the action for defamation of personal reputation or of the action for deceit."

*Black & Yates v. Mahogany Ass'n*, 129 F.2d 227, 236 (3rd Cir. 1942), *cert. den.* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942).

A problem developed from the early confusion with the old dogma that "equity will not enjoin a continuing libel or slander." To avoid this problem in cases where a competitor's goods were disparaged, some courts characterized the matters before them as unfair competition actions and enjoined disparaging statements under that heading. See *Id.*, at 235; *Royer v. Stoody Company*, 192 F.Supp. 949, 951, 952 (W.D. Okl.1961); *Prosser, supra* at 917. This Court need not bother with such characterizations, for the United Stats Court of Appeals for the Third Circuit faced the problem head-on in *Black & Yates, supra*, and recognized that disparagement stands on an entirely different footing than libel and slander.

"Assuming that the plaintiffs here have pleaded nothing more than an action for disparagement of goods, that is to say, a 'pure' trade libel, . . . [t]he need for granting equitable relief in cases like the present, where there are involved genuine proprietary interests of great social and commercial significance to the parties affected, is urgent."

*Black & Yates, supra*, at 236. The plaintiff having pleaded disparagement, this Court will view the law in this light.

■ It being clear that disparagement can be enjoined when a proper case is presented, and that no special damages need be shown or alleged for such relief, see *Id.*, at 230; *Edwin L. Wiegand Co. v. Harold E. Trent Co.*, 122 F.2d 920, 924 (3rd Cir. 1941), the task now becomes one of defining the cause of action. In *Paramount Pictures v. Leader Press*, 106 F.2d 229, 231 (10th Cir. 1939) the court described disparagement as follows:

"One without privilege so to do, has no right to issue and publish an untrue or deceptive statement of fact which has a disparaging effect upon the quality of another's property, under circumstances which would lead a reasonable person to foresee that it will have such effect. The making of such a statement in such circumstances is tortious."

It has also been said that:

"[t]he disparagement itself may be by implication, as where the statement that one portrait of a President is the first one made of him is understood to mean another is not."

*Prosser, supra*, at 919.

*Testing Systems, Inc. v. Magnaflux Corp.*, 251 F.Supp. 286 (E.D.Pa.1966) provides an excellent analysis of the type of statements which are considered actionable. In that case the defendant was alleged to have published a "false report to the effect that the United States Government had tested plaintiff's product, and found it to be only about 40% as effective as that of the defendant." *Id.*, at 288. In addition, the defendant's agent had stated to plaintiff's customers that plaintiff's "stuff was no good" and that "the government is throwing them out." *Id.* The court noted:

". . . that a statement which takes the form of an unfavorable comparison of products, or which 'puffs' or exaggerates the quality of one's own product is not ordinarily actionable."

*Id.* Supporting this view is the old English case of *White v. Mellin*, A.C. 154 (1895), where the defendant had advertised his product was more healthful than the plaintiff's product. That court's decision that such unfavorable comparisons were not actionable, was based:

". . . on the near impossibility of ascertaining the truth or falsity of general allegations respecting the superiority of one product over another. To decide otherwise, . . . would turn the courts 'into a machinery for advertising rival productions by obtaining a judicial determination [as to] which of the two was better.'"

*Testing Systems, Inc., supra.* On the other hand:

> "[t]he tradesman must be assured that his competitors will not be suffered to engage in conduct which falls below the minimum standard of fair dealing."

*Id.,* at 289. The court concluded:

> "[t]here is a readily observable difference between saying that one's product is, in general, better than another's . . . and asserting, as here, that such other's is only 40% as effective as one's own. The former, arguably, merely expresses an opinion, the truth or falsity of which is difficult or impossible [to ascertain]. The latter, however, is *an assertion of fact,* not subject to the same frailties of proof, *implying that the party making the statement is fortified with the substantive facts necessary to make it.*" (emphasis added).

*Id.*

In addition to the general description of disparagement outlined above, two other more difficult aspects of the cause of action must be examined—the issues of malice and burden of proof.

■ As to malice, there is much disagreement. The view taken in the Restatement of the Law of Torts, § 629, is that if a disparaging statement is made or reasonably understood as such, it is immaterial that the person making it did not intend to be understood in that manner. This strict liability approach is sharply criticized by Professor Prosser as predicated on a false analogy to cases of personal defamation. See Prosser, *Injurious Falsehood: The Basis of Liability,* 59 Colum.L.Rev. 425 (1959); Prosser, *Law of Torts, supra* at 921. Prosser points out, however, that malice can be sufficiently established when the defendant acts "for the purpose of doing harm to [or affecting] the interests of the plaintiff in a manner in which he is not privileged so to interfere." *Id.*[13] This Court need not decide which of these two views is the better[14], for even under Prosser's approach the Court finds that defendant, Scientific Games, its officers and agents, acted with the intent to affect, if not harm the plaintiffs' interests. Of this there can be little doubt when one considers the nature of the statements of defendants' agents in both initiating and pursuing conversations with the lottery directors using plaintiffs' tickets.

■ The most difficult aspect of a disparagement action involves the issue of the burden of proof. Prosser, in his discussion of this tort discloses two views on this issue. In *Law of Torts, supra* at 920, Prosser states:

> ". . . the plaintiff must plead and prove not only the publication and its disparaging innuendo, as in defamation, but something more. There is no presumption, as in the case of personal slander, that the disparaging statement is false, and the plaintiff must establish its falsity as a part of his cause of action."

Five pages later, in examining the role of privilege in disparagement cases, Prosser states:

> "The privilege of competition for future business, as distinguished from the protection of an existing interest, has been recognized only to a limited extent. *False statements of fact disparaging the quality of a competitor's goods,* or the conduct of his business, are regarded as 'unfair' methods of competition, and *are never privileged.* The defendant who violates the rules of business ethics against disparaging attacks upon the business of a competitor *must be prepared to prove that his assertions are true . . . .*" (emphasis added).

In resolving this conflict, it is important to keep in mind that allocating the burden of

---

13. It must also be noted that malice can be presumed from the mere fact of publication in some cases; the burden being on defendant to rebut the presumption. See *Andrew v. Deshler,* 45 N.J.L. 167 (1883).

14. This Court does find it a bit odd to conclude that just because one's disparaging acts on statements are not privileged, that liability must, attach in all cases. There probably should be some intent to affect the plaintiff.

760

proof is a function of policy rather than dogma. See generally, McCormick on Evidence, Sec. 337 (2nd ed. 1972).

In stating that plaintiff has the burden of proving falsity of the disparaging statement, Prosser cites five cases in support. It is important to note that all of these cases are "slander of title" actions. In this type of case:

"[the] rival claimant is privileged to disparage another's property [title] in land . . . by an honest assertion of an inconsistent legally protected interest in himself."

Restatement of Torts, Sec. 647, pp. 364–365 (1938). See also Prosser, *Law of Torts, supra* at 924.

"Where a defendant acts in pursuance of a *bona fide* claim which he is asserting honestly, *although without right as eventually appears from an adjudication by a court of competent jurisdiction*, such defendant will not be penalized in damages . . . ." (emphasis added).

*Rogers Carl Corp. v. Moran*, 103 N.J.Super. 163, 168, 246 A.2d 750 (A.D.1968). In this latter sense, Prosser would seem to be correct. The plaintiff would have the burden of proving that the disparaging statement—the assertion of title or a legal interest in certain property—was false. That is, proving that the defendant had, in fact, no legal interest in the plaintiff's property and asserted same without right. See, for example, *Rogers Carl Corp., Id.* Proving the falsity of the asserted legal interest is a part of plaintiff's overall burden in a slander of title suit which is often carried by affirmatively proving the strength of his own interest.[15]

Regarding disparaging remarks about the quality of one's goods, and Prosser's statement that a competitor must prove his assertions true, *Mowry v. Raabe*, 89 Cal. 606, 27 P. 157 (1891), cited by Prosser, is instructive. The defendant in that case, the Butcher's Protective Union, distributed a circular stating that Chinese pork was spreading disease and causing death, that consumers should not buy it, and that plaintiff was selling Chinese pork. The defendant asserted the statements were true and proved that Chinese pork was often diseased, and that plaintiff occasionally sold Chinese pork. The court held:

". . . that the justification [for such statements] required defendants to prove not only that the pork sold by the plaintiff was obtained from the Chinese, . . . but also that it was unsound. They offered no evidence which tended to establish that fact. The publication was therefore false and malicious."

*Id.*

As a matter of policy in the disparagement of quality cases, it would appear eminently fair and reasonable to place the burden of proving the truth of the disparaging statement upon the speaker. In this context a competing trader's disparaging statements to another's current or potential customers do not involve any type of protection of the former's title in his own goods. (e. g., "the protection of an existing interest" which Prosser distinguishes from competing for future business). He makes such statements to decrease the others sales and to increase his own. This Court can see no reason why one disparaging the quality of another's goods should be given *prima facie* protection in making such statements. To require the plaintiff to prove the falsity of a defendant-competitor's disparaging remarks would place an incred.'' 'e burden upon him especially in situations where the facts are likely to be within the knowledge of the defendant. See *McCormick, supra* at p. 786, ft. n. 16. Considering the unfair competition aspects of such cases and the modern view that all businessmen "play by the rules of the game," see *Ass'n. Group Life, Inc. v. Catholic War Veterans*, 120 N.J.Super. 85, 293 A.2d 408 (A.D.1971), placing the burden on the defendant is justified. Such approach will be all the more reasonable and appropriate where the courts are

15. Whether plaintiff recovers or not turns on whether it can prove the defendant acted maliciously.

diligent in examining whether the statements under consideration are merely unfavorable comparisons, puffing or opinion, or whether they are statements of fact. See *Testing Systems, Inc. supra* at 288, 289. In this way the constitutional and competitive interests of all parties and the public will be adequately protected. *Id.* For the foregoing reasons, this Court concludes that the defendants have the burden of proving that any disparaging statements made regarding the plaintiffs' product were true.[16]

■ In view of the foregoing discussion and an evaluation of the facts, this Court concludes that the defendant, Scientific Games, its officers, agents and employees, made false and disparaging statements about plaintiffs' instant lottery ticket to their current and potential customers. The statement to the Omaha lottery director regarding the New Jersey State Police findings was never proven to be true. In fact, the defendant offered no evidence at all on this point. References to the Michigan lottery, while not completely false, were certainly misleading. Plaintiffs' original Michigan ticket was apparently secure, but there was another problem with the ticket which plaintiffs could not rapidly remedy without forfeiting some security. Insecurity was not the sole reason for plaintiffs losing the Michigan contract. Moreover, the Omaha ticket was not the same as the Michigan ticket.

Statements to the effect that ticket agents in Omaha were "ripping off" the public by breaking the ticket were clearly false, for plaintiff established that there were no problems with the Omaha instant lottery. Moreover, to the extent that rumors were spread about the above activity, where the rumor is known to be false or is spread to harm another it can be said to be disparaging.

Another statement which was made to lottery officials by several individuals connected with Scientific Games was that plaintiffs' tickets, both Delaware and Omaha, were insecure or could be broken. Considering the circumstances under which such statements were made, it is clear and any reasonable person could foresee that they would have a disparaging effect upon the quality of plaintiffs' product. See *Paramount Pictures, supra.* In addition such statements are statements of fact in the context of this case.[17] As was noted earlier, any ticket can be "broken" given the time, money and equipment, but that term was not used in that sense when the individuals made their statements. This Court finds that references to insecurity and breaking in these statements were meant and reasonably interpreted by the directors to mean that selling agents or others could quickly, easily and inexpensively determine what was under the covering medium without rendering the ticket unsalable. Viewed in this sense, it was never proven that plaintiffs' Delaware and Omaha lottery tickets were insecure. The Omaha instant lottery game ran to its conclusion without any indication that ticket security had been broken. As for the Delaware ticket, although some might have remained salable after determination of the numbers under the spots, it was never proven that these tickets were "broken" or insecure in the latter sense of the word.

Those individuals connected with Scientific Games were repeatedly asked by the lottery directors how the tickets could be broken. In most cases they refused to inform the directors how it could be done. On certain occasions defendant's representatives might have described a few techniques to the directors, but never successfully demonstrated these techniques either to them or to this Court. In some cases the response to the director's inquiry was a cursory comment to the effect that "it's easy" or "it did not take long." In other cases, the response was to the effect that "a

---

16. As will be hereinafter discussed, the falsity of a few of the statements defendants made has been established at least for purposes of this motion for preliminary relief.

17. See *Testing Systems, Inc., supra* at 289 concluding statements there were ". . . assertion[s] of fact . . . implying that the party making the statement is fortified with the substantive facts necessary to make it."

child could break it"—a statement which in itself is disparaging by implication. See Prosser, *Law of Torts, supra* at 919; *Testing Systems, Inc., supra* at 289. It was clear from the testimony that the lottery directors, in light of their position, had no choice but to listen to and consider the assertions made about the tickets they were using. Never being given the critical verification as to how the ticket could be broken, however, they were placed in the frustrating position of being filled with doubts yet unable to make an informed judgment to resolve them. In short, if the tickets could be broken so as to make them insecure, the directors were never shown this, nor was this Court.

The defendant's explanation to the lottery directors for its refusal to reveal how the tickets were allegedly broken was to the effect that it did not wish to disclose trade secrets or educate plaintiffs on how to improve their ticket. Whatever justification this may be for defendant's failure to explain to the lottery directors, it is no justification for defendant's failure to explain or demonstrate to this Court how the tickets could be broken.[18] As noted earlier, this Court has not been shown that plaintiffs' tickets could be broken so as to render them insecure. In addition, there is some doubt as to whether the information the defendant was withholding constitutes a trade secret at all. See Restatement of Torts, Sec. 757, comment b (1939). Even if it is a trade secret, however, the defendant should not fear a loss of secrecy if he reveals the information to a lottery director "in confidence." Under such circumstances, the law protects the defendant.

> "The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse."

*Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315, 322 (1974). See also *Greenberg v. Croydon Plastics Co., Inc.,* 378 F.Supp. 806, 812 (E.D. Pa.1974).

While this Court concludes that several statements made by Scientific Games' representatives were false and disparaging, there remains the question of whether preliminary injunctive relief is proper, and, if so, what form it should take. The plaintiff has established a reasonable probability of success upon a trial on the merits, and, in view of the rapid and continuing expansion of instant lottery business, the Court concludes that plaintiffs will suffer irreparable injury *pendente lite.* See *Oburn, supra.* Considering the actions taken by the defendant, there is little possibility of harm to it from a properly drawn order. The most important consideration for this Court in granting injunctive relief is a consideration of the public interest. The defendant would have this Court deny injunctive relief altogether for it views its activities as service in the public interest. This Court disagrees.

> "It would be remarkable if a communication, having for its manifest object harm to the business of a competitor, could be viewed as a bona fide discharge of a public or private duty, legal or moral, in the prosecution of the [speaker's] own rights and interests [citation omitted], and the protection of the common interest involved. It has yet to be accepted that any business is privileged to advance itself by pulling down a competitor through unfair trade practices."

*Aetna Life Ins. Co. v. Mutual Benefit Health & Acc. Ass'n.,* 82 F.2d 115, 119 (8th Cir.1936); Prosser, *Law of Torts, supra* at 924. It cannot be denied, however, that important questions of public interest are present in the case, and, as just noted, must be considered in shaping injunctive relief.

At the outset, it is very important to note the critical role of the lottery director in the instant lottery business. As Acting Director Simmons aptly stated:

---

18. Trade secrets are not privileged and must be disclosed when a substantial need exists. *Natta v. Zletz,* 405 F.2d 99, 101 (7th Cir. 1968).

" . . . any lottery director who is about to market a game, where there are concerns about the game, you have great apprehension.

\* \* \* \* \* \*

I have to listen to anybody in this kind of business who has or believes he has a method by which my game can be broken, *to protect the integrity of the State of Delaware.*

\* \* \* \* \* \*

I think in my position you really get to a point where you really don't care whose tickets are going to market. *The important thing is to best serve the State of Delaware and provide a ticket which is marketable and secure.*" (emphasis added).

T.—I, p. 151, 191.

In view of the strong public interest which must be protected by the lottery directors and this Court, injunctive relief must be tailored to grant greater latitude in certain circumstances. When a lottery director makes an *unsolicited request for ticket evaluation* by the defendant, the public interest would not be served by an injunction which might hinder an open and factually accurate response. On the other hand, as this case makes clear, statements regarding insecurity without explanation of how a ticket is broken serve no purpose at all. Considering that trade secret information given to the lottery director by way of explanation will be protected if given in confidence, there is little reason why defendant should not relate how a ticket was broken. Moreover, if defendant truly desires to act in the public interest, it should be willing to explain how a ticket was broken in any event.

The plaintiffs have also asked the Court to enjoin the defendants from interfering with plaintiffs' contractual relations. The Court feels, however, that the interference complained of extended no further than the disparagement already enjoined, and plaintiffs have not shown any other interference by which they have or are likely to suffer irreparable injury. It should also be noted

that to the extent that Scientific Games' representatives will act at the request of lottery directors and give full assistance in the public interest, this Court considers such activity privileged. Restatement of Torts, Sec. 772 (1939); Prosser, *Law of Torts, supra* at 944.

■ Up to this point in the opinion, the discussion has centered largely on the activities of defendant, Scientific Games. So far as this Court could determine none of the heretofore described activities can be attributed to the other defendant, Dittler Brothers. Plaintiffs allege, however, that Dittler Brothers engaged in disparagement of a different type. By sending Mathematica a letter charging patent infringement and sending a copy of it to director Simmons, plaintiffs contend that Dittler disparaged the former's ticket. While such activity can constitute disparagement by implication, see Prosser, *Law of Torts, supra* at 921, it is generally privileged when made in good faith. See *Id.,* at 925; *Zephyr American Corp. v. Bates Mfg. Co.,* 59 F.Supp. 573, 576 (D.N.J.1945); *H.E.S. Machine Tool, Inc. v. LeBlond, Inc.,* 182 U.S.P.Q. 598 (D.N.J. 1974).

35 U.S.C. § 287 requires that notice of patent infringement be given alleged infringers before an infringement suit may be brought. Defendant, Dittler, contends that it was merely acting to fulfill the statutory requirements. The plaintiffs argue that the notices of alleged infringement were entirely without foundation considering the scope of the defendant's patent and, thus, given in bad faith. In support of this argument, plaintiffs have submitted for the Court's consideration the filed Claims and the file history on each of the three patents defendant alleges are infringed. A review of these materials, cursory though it was since this is not a trial on the merits, indicates that there is serious doubt as to whether the plaintiffs' ticket infringes upon any of defendant's patents. It must be remembered, however, that the Court does not have before it a motion to enjoin the giving of infringement notices because there is a strong likelihood that there is no

infringement. This issue was not directly raised, and the defendant did not address it. The only issue before the Court is whether the notices of infringement were so entirely without foundation as to constitute bad faith. This Court concludes they were not.

An order has issued.

## ORDER

This matter having come before this court on plaintiffs' motion for a preliminary injunction to enjoin the defendants from continuing certain unfair practices; and

This court having considered the testimony, the briefs and memoranda submitted in support of and in opposition to the plaintiffs' motion;

It is on this 22nd day of March 1976

ORDERED that defendant Scientific Games Development Corporation, its officers, agents, employees and any other persons acting in concert with the above, be and are hereby enjoined from making, uttering or publishing false and disparaging statements, whether direct or indirect, regarding plaintiffs' instant lottery tickets, this to include statements that plaintiffs' instant lottery tickets are not secure or can be "broken"; statements relating to rumors of ticket selling agents taking advantage of the alleged insecurity of plaintiffs' instant lottery tickets; and other similar statements or innuendo regarding the security of plaintiffs' instant lottery tickets; and

It is further ORDERED that there being no sufficient showing of impropriety on the part of defendant Dittler Brothers, Inc., said defendant not be specifically enjoined from any activity except insofar as its officers, agents and employees may be said to be acting as an agent for or in concert with defendant Scientific Games Development Corporation, as set forth above; and

It is further ORDERED that the defendants Scientific Games Development Corporation and Dittler Brothers, Inc., their officers, agents, employees and those acting in concert with them, shall not be held to be in violation of the aforesaid orders as they relate to statements regarding ticket security, when responding to an unsolicited written request for assistance in ticket evaluation from a state, local or commercial lottery director, except that such responses as relate to ticket security must be accompanied by a full explanation as to how the ticket was determined to be insecure; and

It is further ORDERED that this court's Secrecy Order of March 8, 1976 continue in full force and effect; and

It is further ORDERED that this order remain in effect until further order of this court.

## CLARIFICATION and MODIFICATION OF THE COURT'S ORDER

From the post hearing motion papers and briefs of both defendants, it has become apparent to the Court that there is some misunderstanding of the March 22nd order. Accordingly, the Court will now make an attempt at clarification.

First and foremost, the order enjoins only those statements regarding plaintiffs' lottery tickets which are *both false and disparaging*.

Defendant, Dittler Brothers, is enjoined only insofar as it could be considered acting as an agent for or in concert with the defendant, Scientific Games. As such, this latter portion of the order does not state an extraordinary proposition.

The portion of the order which has created the greatest misunderstanding is that dealing with communications between the defendants and lottery directors. The order states that the defendants:

" . . . *shall not be held to be in violation of the aforesaid orders* as they relate to statements regarding ticket security, when responding to an unsolicited written request for assistance in ticket evaluation from a state, local or commercial lottery director, except that such responses as relate to ticket security must be accompanied by a full explanation as to how the ticket was determined to be insecure . . ." (Emphasis added).

This is not to say that this is the only manner in which the defendants may com-

municate with lottery directors regarding the plaintiffs' lottery ticket. See discussion regarding modification, *infra*. Where *true* statements of fact are made, the defendants do not contravene this portion of the order.

As was stated in the Court's Findings of Fact and Conclusions of Law:

"In view of the strong public interest which must be protected by the lottery directors and this Court, injunctive relief must be tailored to grant greater latitude in certain circumstances. When a lottery director makes an *unsolicited request for ticket evaluation* by the defendant, the public interest would not be served by an injunction which might hinder an open and factually accurate response." (Emphasis original).

With this in mind, the Court endeavored to ensure that candid and *substantiated* factual statements regarding the security of plaintiffs' lottery tickets could be presented under circumstances where, regardless of whether the plaintiffs' instant ticket is ultimately determined to be secure or insecure,[19] defendants would not have to act in fear of contempt. Where defendants act in accord with this portion of the order, the full, factual, good faith explanation by the defendants of how the plaintiffs' ticket was determined to be insecure will insulate defendants from contempt. When lottery directors have the objectively verifiable facts before them, they can best perform their official duties and the public interest is protected.

Upon further reflection and consideration of the latter portion of the March 22nd order and upon consideration of the affidavits on file and portions of the testimony as both relate to the practices in the industry, this Court has, on its own initiative, decided to modify this portion of the order by striking from it the word "unsolicited". That this Court has inherent power to modify its preliminary decree is clear. *United States v. Swift & Company,* 286 U.S. 106, 114, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999, 1005, 1006 (1932); *Consolidated Edison Co. of N.Y., Inc. v. F.P.C.,* 167 U.S.App.D.C. 134, 511 F.2d 372, 378 (1974); *Rankin v. Coleman,* 401 F.Supp. 664, 665 (E.D.N.C.1975); 11 Wright and Miller, *Fed.Prac. and Proc.,* Civil § 2961. Moreover, the order specifically states that it shall remain in effect until further order of this Court.

By removing the word "unsolicited", the Court seeks to provide for a less restricted flow of *substantiated* factual information from which lottery directors and the public can benefit. As was noted above and is clear from this Court's earlier opinion, when lottery directors have objectively verifiable facts before them, they are in the best possible position to determine the security or insecurity of a given ticket for their purposes. This Court does not wish to disrupt the acquisition of these facts or oversee a director's determination. When this latter portion of the order is complied with, it will do neither. When unsubstantiated statements such as those found to have been made in Omaha and Delaware are involved, however, this Court will examine them to determine if they contravene the first portion of the March 22nd order regarding "false and disparaging" statements.

Thus, when the defendants are responding to written requests for assistance in ticket evaluation from a lottery director

---

19. This Court again wishes to make clear that in the context of this case, with ticket manufacturers speaking directly to lottery officials, statements that a ticket is "insecure" or "can be broken" are assertions of fact which are objectively verifiable and which imply that the person making the statement has the substantive facts to support it. Such statements made under the circumstances of this case convey "a piece of information presented as having objective reality". *Webster's New Collegiate Dictionary,* G. & C. Merriam Co., Springfield, Mass. 1975. While it is true that a lottery director must ultimately make a judgment on the security of a given ticket, much like courts and juries determine which factual assertions are true and false, this does not reduce the aforesaid statements to "opinions" as defendants contend. See discussion in Findings and Conclusions regarding *White v. Mellin* and *Testing Systems v. Magnaflux Corp.* To resolve the issue further would involve a metaphysical debate better left to philosophers.

766

and such responses as relate to ticket security are accompanied by a full and factual explanation of how a ticket was determined to be insecure, the defendants' statements are privileged. This qualified privilege is brought about in these circumstances because of the strong public interest in the security of lottery tickets. W. Prosser, *Law of Torts,* 924 (4th Ed. 1971). Said statements will not be actionable absent a showing by the plaintiffs that defendants knew they were false or made said statements in reckless disregard for their truth or falsity. *Id.* As this Court's original opinion makes clear, however, statements such as those found to have been made in Omaha and Delaware (*e.g.* "plaintiffs' ticket is insecure"; "it can be easily broken"; "a child could break it"; "ticket agents are ripping off the public") which go unexplained and unsubstantiated are not privileged, and the defendants must be prepared to prove these assertions are true. Prosser, *supra,* at 925.

Submit an order.

## THE SECRECY ORDER

So as to avoid any confusion among the parties and to resolve any potential conflict between certain provisions of the Court's March 22nd order, the Court's so-called secrecy order entered at the request of the parties on March 8, 1976 shall no longer apply to any material filed with this Court after March 22, 1976. The secrecy order will continue to apply to all transcripts, exhibits, pleadings and other material filed before the aforesaid date. This order will also continue to apply to material which would disclose trade secrets and answers to defendants' counter claims.

Submit an order.