**SYSTEM OPERATIONS, INC., a Delaware Corporation, and Mathematica, Inc., a New Jersey Corporation**

v.

**SCIENTIFIC GAMES DEVELOPMENT CORPORATION, a Michigan Corporation, and Dittler Brothers, Inc., a Georgia Corporation, Appellants.**

**Nos. 76–1691, 76–1692.**

United States Court of Appeals, Third Circuit.

Argued Jan. 10, 1977.

Decided May 3, 1977.

As amended May 24, 1977.

5. See also *United States v. Wright,* 524 F.2d 1100, 1101–1102 (2 Cir. 1975).

See also, D.C., 425 F.Supp. 130.

**1134**

Edward J. McCardell, Jr., Jamieson, McCardell, Moore, Peskin & Spicker, Trenton, N. J., Michael C. Murphy, Robert L. Mote, Ralph H. Greil, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for Scientific Games Development Corp.

James J. McLaughlin, McLaughlin, Abbots & Cooper, Trenton, N. J., Eugene G. Partain, Harvey D. Harkness, Powell, Gold-

stein, Frazer & Murphy, Atlanta, Ga., for Dittler Brothers, Inc.

William Miller, Allen D. Porter, Miller & Porter, Princeton, N. J., for appellees.

Before ROSENN and HUNTER, Circuit Judges, and SNYDER, District Judge.*

### OPINION OF THE COURT

ROSENN, Circuit Judge.

The genesis of this litigation is the calculating appeal of state governments to the gambling instincts of their respective constituents as an important tool to raise operating revenues. This growing phenomenon in state government [1] has fanned a blazing competition between the parties in this proceeding for state and municipal contracts in the lucrative and fast-growing "instant lottery" ticket market. This action is an outgrowth of that heated rivalry.

### I.

System Operations, Inc., a 76 percent owned subsidiary of plaintiff Mathematica, Inc., a New Jersey corporation, is engaged in the designing, marketing, and implementing of public lotteries. Both plaintiff corporations ("System") maintain their principal places of business in New Jersey. Defendant Scientific Games Development Corp. ("Scientific"), a Michigan corporation, competes with System in public lottery consulting, designing, and marketing and often works jointly with defendant Dittler Brothers, Inc., ("Dittler"), a specialty printer, in designing lottery tickets. Both defendant corporations maintain their principal places of business in Georgia.

In an instant lottery, unlike the more traditional weekly or monthly lottery, each ticket is a pre-determined winner or loser. The determinative numbers, letters, or symbols on each ticket are concealed from view by a coating of gold leaf or other opaque material which can be rubbed off by the

* Daniel J. Snyder, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. The thirteen states that run lotteries grossed a total of 1.1 billion dollars in 1976, according to a report in the Philadelphia Inquirer, April 19, 1977, at 3–A, col. 6.

purchaser of the ticket, thereby instantaneously providing such person with the good, or more often, sad results.

The key to a successful instant lottery is in the coating process. The ticket coating must resist all attempts to see through it or around it with special equipment: if the hidden numbers can be read without leaving visible evidence that the ticket has been disturbed, the lottery is doomed to failure; unscrupulous dealers will cull out the winning tickets and sell only the losers to unsuspecting members of the public. As the number of winners among the public declines, confidence in the game diminishes; ticket sales fall off. The end result is a degenerating lottery with less revenue for the sponsoring state or city.

In the instant lottery business, a ticket is said to be "broken" if a feasible means of reading the hidden numbers has been discovered; a ticket is "non-breakable" or "secure" if such reading is impossible. Ticket security is the paramount concern of instant lottery directors. Allegations that a ticket has been broken or is insecure can threaten the success of a lottery and must be taken seriously.

System instituted an action in the United States District Court for the District of New Jersey charging Scientific and Dittler with antitrust violations, seeking a declaratory judgment that certain patents held by the defendants are invalid, and alleging that the defendants have engaged in a widespread campaign to falsely disparage the security of System's lottery ticket and to interfere with its contractual relations with various lottery commissions around the country. On this common law cause of action, System requested both damages and permanent injunctive relief, and applied to the district court for an immediate preliminary injunction against further disparagement of its instant lottery ticket and further interference with its contractual relations. The district court entered an order granting the preliminary injunction and it is that order which we are called upon to review.[1A] Although the district court's sub-

ject matter jurisdiction is based on federal questions of antitrust and patent law under 28 U.S.C. §§ 1337, 1338, 2201, and 2202 (1970), it had pendent jurisdiction over the plaintiffs' state law claims of product disparagement and interference with contract. This court has jurisdiction under 28 U.S.C. § 1292(a)(1) (1970) to review the order granting the preliminary injunction.

In its complaint, System alleges that Scientific and Dittler falsely and maliciously disparaged the security of System's instant lottery ticket to lottery officials in the states of Delaware, Illinois, Michigan, New Jersey, and in the city of Omaha, Nebraska. Although further proceedings in this case may well deal with instances of alleged disparagement in all these states, in the hearing on the motion for the preliminary injunction the district court, with the consent of the parties, focused exclusively on the defendants' activities in Delaware and Omaha. The court found that in both these areas, Dr. Koza, the chairman of the board of directors of Scientific, made numerous statements to lottery officials that the System ticket was easily broken, that it had been deemed insecure by police of several states, and that dealers were breaking the tickets and "ripping off" the public. But the court found no evidence that Dittler engaged in such activities. In spite of Scientific's alleged campaign of disparagement, System managed to retain the Delaware contract previously awarded to it while competition for the Omaha contract became moot upon the cancellation for other reasons of the Omaha game.

Finding that the parties "were almost constantly negotiating or bidding on contracts" in many states, the district court entered the following order:

> ORDERED that defendant Scientific Games Development Corporation, its officers, agents, employees and any other persons acting in concert with the above, be and are hereby enjoined from making, uttering or publishing false and disparaging statements, whether direct or indi-

---

1A. The district court opinion is reported at 414 F.Supp. 750 (D.N.J.1976).

rect, regarding plaintiffs' instant lottery tickets, this to include statements that plaintiffs' instant lottery tickets are not secure or can be "broken"; statements relating to rumors of ticket selling agents taking advantage of the alleged insecurity of plaintiffs' instant lottery tickets; and other similar statements or innuendo regarding the security of plaintiffs' instant lottery tickets; and

It is further ORDERED that there being no sufficient showing of impropriety on the part of defendant Dittler Brothers, Inc., said defendant not be specifically enjoined from any activity except insofar as its officers, agents and employees may be said to be acting as an agent for or in concert with defendant Scientific Games Development Corporation, as set forth above.[2]

Scientific and Dittler appeal from this order. Because we conclude that the preliminary injunction cannot be sustained under the applicable New Jersey law and also because the district court failed to require plaintiffs to post a security bond, we reverse the order of the district court and remand the case for further proceedings.

## II.

The threshold issue which confronts us is the choice of law. The issue is knotty, for the allegedly disparaging statements of which System complains were published in New Jersey, Delaware, Nebraska, Michigan, and Illinois by a company headquartered in Georgia concerning products of companies with principal places of business in New Jersey. The problem is made more complex by the broad scope of the preliminary relief granted: the injunction restricts the conduct of the defendants not only in the foregoing states but also in every state in the Union in which they might compete for future lottery contracts. In addition, System seeks both damages for disparaging communications which were allegedly published in these states and a permanent injunction against all future disparagement regardless of the state in which it occurs.

■■■ In skirting the choice-of-law problem and basing its decision in part on case law from jurisdictions some of which have no apparent relationship to this case,[3] the district court violated the command of *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that a federal district court adjudicating a state law issue must apply the law of the forum state, including that state's choice-of-law rules. *See Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19 (3d Cir. 1975). Although *Klaxon* was a diversity jurisdiction case, the same principle holds true with respect to pendent jurisdiction claims. *See UMW v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Mintz v. Allen*, 254 F.Supp. 1012 (S.D.N.Y.1966). Since the present cause of action for product disparagement is indeed based on state, not federal, law, the district court's selection of applicable rules of product disparagement law should have been governed by the choice-of-law principles of the forum state, New Jer-

---

**2.** The district court also ordered that the defendants, their officers, agents, and those acting in concert with them "shall not be held to be in violation of the aforesaid orders as they relate to statements regarding ticket security, when responding to an unsolicited written request for assistance in ticket evaluation from a state, local or commercial lottery director, except that such responses as relate to ticket security must be accompanied by a full explanation as to how the ticket was determined to be insecure . . . ." The district court subsequently modified this phase of the order to delete the word "unsolicited."

**3.** The district court had this to say on the choice of law issue:

This Court could find no significant legal differences among the states in the area of disparagement. This is truly a developing area of the law and my references are general, guided only in part by New Jersey and Third Circuit authorities.

414 F.Supp. at 757 n. 12. If the district court's finding that there were no significant legal differences among the states were correct, such an approach would be appropriate. In this case, however, the absence of differences is contradicted by the district court's application of rules of disparagement law derived from other jurisdictions which are inconsistent with the law of New Jersey, as we discuss in the text, *infra*.

sey. *See Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3d Cir. 1975). The district court having failed to follow this course, it becomes our obligation to distill from those New Jersey choice-of-law principles a rule by which we can select the applicable body of product disparagement law.[4]

As we recognized in *Henry, supra*, New Jersey courts have abandoned the traditional *lex loci delicti* approach to choice of law problems in tort cases in favor of the more flexible governmental interest analysis. *See, e. g., Rose v. Port of New York Authority*, 61 N.J. 129, 293 A.2d 371 (1972); *Mellk v. Sarahson*, 49 N.J. 226, 229 A.2d 625 (1967); *Breslin v. Liberty Mutual Ins. Co.*, 125 N.J.Super. 320, 310 A.2d 527 (1973). Although most of the modern New Jersey decisions dealing with the choice of applicable rules of tort law have come in personal injury cases, a recent New Jersey defamation case suggests that governmental interest analysis also will be used in that context. *See Barres v. Holt, Rinehart & Winston, Inc.*, 131 N.J.Super. 371, 330 A.2d 38 (Law Div. 1974), *aff'd* 141 N.J.Super. 563, 359 A.2d 501 (App. Div. 1976). Bearing in mind the close relationship between defamation and disparagement, *see, e. g.*, Restatement (Second) of Conflicts of Law § 151 (1973), we are convinced that New Jersey courts would also resolve the choice-of-law problem in a product disparagement case by identifying and weighing the interest of each state in having its own product disparagement law applied.

The first step in assessing a state's interest in having its law applied to a particular issue is to understand the policy considerations which underlie the law in question.

That is readily done in the present case, for we may assume that any state's product disparagement law represents a considered balance between protection of the good reputation of products from unfounded attack on the one hand and encouragement of free and robust debate on matters of public interest (including the relative merits of products offered for sale to the public) on the other.[5] By adjusting the rules relating to damages, malice, proof of falsity, and privilege, each state is able to determine for itself just where that delicate balance will be struck. Each state's law of product disparagement thus embodies policy considerations regarding interests in property, the right to free speech, and, probably, principles of business ethics as well.

Since Nebraska is one of the states in which System complains its tickets were disparaged, application of Nebraska law would presumably further that state's policy judgment as to how protection of reputation and encouragement of free speech are to be balanced when disparagement is published within its borders. It would appear, therefore, that Nebraska has a legitimate and substantial interest in having its law applied and, by the same reasoning, that Delaware, Illinois, New Jersey, and Michigan each have a substantial interest in having their respective laws of product disparagement applied. On the other hand, Georgia's interest cannot be ignored: as the principal place of business of both defendants, Georgia can legitimately claim that application of its law would further its policies pertaining to Georgia's economic well-being and how companies doing business in Georgia comport themselves in competition. Both plaintiff corporations, however, main-

4. At oral argument, when apprised of our concern about the choice-of-law question, the parties offered to stipulate that "general, common law principles" of product disparagement law applied. The effectiveness of such a stipulation, however, must itself be determined by New Jersey choice-of-law principles and we can find no New Jersey decision—nor, indeed, a decision from any other state—allowing the stipulation of applicable rules of law in a tort case. In the absence of any authority, we cannot assume that a New Jersey court would allow the parties to a tort action to choose their own rules of law in disregard of New Jersey policy as embodied in its choice-of-law rules. We therefore decline to give effect to the proffered stipulation. *See Consolidated Water Power & Paper Co. v. Spartan Aircraft Co.*, 185 F.2d 947 (3d Cir. 1950). *But cf. In re Malloy's Estate*, 278 N.Y. 429, 17 N.E.2d 108, 109 (1938).

5. *See generally* Note, *Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation*, 75 Colum.L. Rev. 963 (1975).

tain their principal places of business in New Jersey and application of New Jersey law would further New Jersey economic and social policies affecting the operations of New Jersey companies. In addition, each state in which the parties might engage in future competition has an important interest in having the preliminary injunction under appeal (as well as any permanent injunction which might hereafter be awarded) conform with that state's policies. Given the facts of this case, therefore, we believe a New Jersey court would be hard pressed to single out any one state as having the most significant interest in having its law applied.

■ The Restatement (Second) of Conflicts of Law (1972) would offer some guidance to a New Jersey court were it faced with this seemingly insoluble problem. Section 151 provides that "The choice-of-law rules involving injurious falsehood[6] are the same as those involving defamation." The two related Restatement rules involving defamation are section 149 pertaining to defamatory communications published in one state at a time and section 150 applying to defamatory communications published simultaneously in two or more states ("aggregate communications"). The basic rule is that except in the case of aggregate communications, "the local law of the state where the publication occurs determines the rights and liabilities of the parties." Restatement (Second) of Conflicts of Law § 149 (1973). In the case of aggregate communications, section 150(1) provides

that "the local law of the state which, with respect to the particular issue, has the most significant relationship" applies. Section 150(3) contains a clarification very pertinent to the issue here under discussion:

> When a corporation . . . claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation . . . had its principal place of business at the time, if the matter complained of was published in that state.

■ If the only relief sought in the present action were damages and if no preliminary injunction had been granted, section 149 would require the application of a different state's law to each alleged instance of disparagement. It is possible, as the Restatement itself notes, that when the same communication is made to different persons in different states, each communication by the defamer—or in this case the disparager—will be governed by a different law. *Id.* § 149, comment a at 450–51. We believe, however, that when the relief requested includes preliminary and permanent injunctions with multistate ramifications, the policies underlying sections 149 and 150 are better served by choosing the law of a single state rather than by attempting somehow to apply the laws of many states simultaneously as section 149 seems to require.

■ The basis for our reasoning is that the future conduct reached by a preliminary or permanent injunction of multistate

---

**6.** The terminology in this area is somewhat confusing. False communications which damage or tend to damage the reputation as to quality of goods or services are variously described as "disparagement," "product disparagement," "trade libel," or "slander of goods." False communications which impugn the plaintiff's title to goods or to real property are usually denominated "slander of title." In the law of defamation, "slander" connotes oral and "libel" written communication but "trade libel," "slander of goods," and "slander of title" are used without regard to the manner of publication.

Product disparagement and slander of title are grouped together in the Restatement (Second) of Torts § 623A (Tentative Draft Nov. 13, 1967) [hereinafter cited as "Tentative Draft No. 13"] under the more general term "injuri-

ous falsehood," defined as any false communication which results "in harm to interests of another having pecuniary value"; the definition is broad enough to cover some cases of defamation. Other authorities use "injurious falsehood" as a synonym for product disparagement while still others suggest that "injurious falsehood" be defined as communications of false matter which result in harm to interests of another having pecuniary value but which do *not* constitute defamation, disparagement, or slander of title. *See* W. Prosser, *Law of Torts* § 128 at 915–20 (4th ed. 1971); Tentative Draft No. 13 *supra* § 623A, notes 1 through 4 at 6–13 and comment a at 13; Note, *supra* note 2, 75 Colum.L.Rev. at 963 n. 3, 969 n. 28.

dimensions bears more resemblance for choice of law purposes to an "aggregate communication" than to a series of disparaging communications published separately in the past. Since a court may not be able to anticipate where any future misconduct will occur, it could conceivably have no basis for tailoring the injunction to the law of Nebraska, for example, because certain tortious conduct took place there in the past. It makes more sense, as it does in the case of aggregate communications, to adopt a rule of convenience under which one state's law is chosen pragmatically to govern all future conduct at issue, regardless of the state in which it occurs. Looking to section 150(3), *supra*, and New Jersey's status as both the forum state and the state in which both plaintiff corporations maintain their principal places of business as well as one of the states in which the disparaging communications were published, a New Jersey court would probably, and reasonably, choose New Jersey as the single state whose law should apply.

Our decision, like the rule of section 150, "furthers the choice-of-law values of certainty, predictability, and uniformity of result and of ease of determination and application of the applicable law." Restatement (Second) of Conflicts of Law § 150, comment b at 456. The rule that we believe a New Jersey court would adopt to solve the choice-of-law problem for a case of multistate product disparagement would promote certainty by informing an alleged disparager of the legal standards by which his conduct will be measured. Uniformity of result is achieved when campaigns of disparagement of national scope directed to products of New Jersey-based corporations are judged by New Jersey law regardless of the publication of disparagement in other states. Lastly, a rule which permits the application of the law of a single state rather than a combination of the laws of a

number of states obviously eases the ascertainment and application of the applicable law. Accordingly, we conclude that a New Jersey court would apply New Jersey law to the substantive product disparagement issues in this case. We will therefore review the district court's order under the principles of New Jersey's law of product disparagement.[7]

## III.

### A. *The New Jersey Law of Product Disparagement.*

As a nation, we have evolved since the industrial revolution from a simple agrarian society into a highly industrialized country with dynamic and complex commercial interests. One would expect that such an evolution would be attended by comparable activity in commercial law, and specifically in the law of product disparagement. Surprisingly, this has not been the fact. The enormous growth in commercial and industrial activity has not had a similarly prolific effect on the number of product disparagement cases. This is reflected in the law of New Jersey and of this circuit. In fact, when this court had occasion to consider a product disparagement issue some years ago, we noted that the right of action for disparagement was not only "slow in developing at common law," but that "[t]he early cases took a Shakesperian view." *Black & Yates v. Mahogany Assn.,* 129 F.2d 227, 229 (3d Cir. 1941), *cert. denied,* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942). Thirty-five years later, dubious distinctions still survive between disparagement of products and defamation of corporations on the one hand and unfair competition on the other. Ancient strictures on the powers of a court of equity and false historical analogies to personal defamation have interfered with the

---

7. We do not now decide what law should be applied to the instant action for damages resulting from disparagement which was allegedly published in the past. It may be that each instance of disparagement should be judged, as Restatement § 149 suggests, by the law of the state of publication. On the other hand, compelling considerations of convenience may indicate that New Jersey law, or the law of some other single state, should control. We do advise the district court and the parties that the choice-of-law problems may not be ignored in the future progress of the action.

logical development of the law.[8] Several courts[9] and many commentators[10] have attempted to rationalize and modernize the law. Instructive as these authorities may be, however, we are bound to review the district court's order under the principles of product disparagement as enunciated by the New Jersey courts.

 We predicate our analysis of the New Jersey law of product disparagement on the two New Jersey cases dealing expressly with product disparagement, *Klein v. Millside Farms*, 8 N.J. 240, 84 A.2d 705 (1951); *Henry V. Vaccaro Const. Co. v. A. J. DePace, Inc.*, 137 N.J.Super. 512, 349 A.2d 570 (1975), and the three New Jersey cases dealing with the closely related tort of slander of title, *Andrew v. Deshler*, 45 N.J.Law 167 (1883); *Rogers Carl Corp. v. Moran*, 103 N.J.Super. 163, 246 A.2d 750 (1968); *Frega v. Northern New Jersey Mfg. Assn.*, 51 N.J.Super. 331, 143 A.2d 885 (1958). Our partial reliance on the slander of title cases is justified by the similarity between that tort and product disparagement: both impair the vendibility of the object the plaintiff is trying to sell, the former by impugning title to the object and the latter by casting aspersions on the quality of the object. The similarity is such that the rules of one are usually imported without restraint into cases involving the other. *See, e. g.,* Restatement (Second) of Torts § 623A and note 1 at 6; § 624 and comment a at 18; § 626 and comment a at 27 (Tentative Draft No. 13, 1967). We therefore will assume that a New Jersey court adjudicating a case of product disparagement would be guided by New Jersey precedents in slander of title cases as well as product disparagement cases.

None of the New Jersey product disparagement or slander of title cases expressly delineates the elements of a cause of action for product disparagement or slander of

title but the elements are implied in *Andrew v. Deshler, supra*. In that case, the trial court had granted a non-suit to the defendant in the action against him for slander of title on the ground that the plaintiff had not presented sufficient evidence of malice. The Court of Appeals and Errors found the trial court's views on malice to be erroneous but before reversing, the appellate court had to assure itself that there was no other ground on which the non-suit could be affirmed, that is, that the plaintiff's proof was not deficient in some other respect. In this context, the high court stated:

> The plaintiff proved publication, the falsity of the most material and damaging allegation in the [communication complained of] . . . and special damage resulting from that part of the [communication] alleged to be *mala fide*.

45 N.J.Law at 172.

 This statement, when combined with the court's pronouncement that "in an action for slander of title, there must be evidence of malice, express or implied," *id.* at 169, suggests that New Jersey recognizes an action for slander of title or product disparagement consisting of four elements: (1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i. e., pecuniary harm. The requirement of malice is affirmed by both *Frega* and *Rogers Carl, supra,* while the element of special damages has recently been underscored in *Vaccaro, supra*: "The action requires special damages in all cases, unlike defamation." 349 A.2d at 573.

Thus defined, the New Jersey action for product disparagement is substantially identical to the cause of action for product disparagement described by the Restate-

8. *See* W. Prosser, *supra* note 3, § 128 at 914 and authorities cited in nn. 24, 27–29. *See generally* Note, *supra* note 2.

9. *See, e. g., Black & Yates v. Mahogany Assn.,* 129 F.2d 227 (3d Cir.), *cert. denied,* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942).

10. *See, e. g.,* Nims, *Unfair Competition by False Statement or Disparagement,* 19 Cornell L.Q. 63 (1933), and authorities cited in W. Prosser, *supra* note 3, § 128 at 917 nn. 27–29.

ment (Second) of Torts § 623A (Tentative Draft No. 13, 1967):[11]

§ 623A. *Liability for Publication of Injurious Falsehood*

(1) One who publishes an untrue statement of fact or opinion which he should recognize as likely to result in harm to interests of another having pecuniary value, through the action of third persons in reliance upon the statement, is subject to liability for pecuniary loss resulting to the other from such harm if, but only if,

(a) The publisher is motivated by ill will toward the other, or

(b) He intends to interfere with the interests of the other in a manner which he is not privileged to do, or

(c) He knows the matter to be otherwise than as stated, or that he has not the basis for knowledge or belief professed by his assertion.

B. *The Application of New Jersey Law.*

Our task now is to determine whether the district court's order can be sustained under our exposition of the New Jersey law. Since we are reviewing a preliminary injunction, not a final judgment, our task is made somewhat more complex. Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions. *See* 11 Wright & Miller, *Federal Practice and Procedure,* § 2943 at 390–91 (1973). The question before us thus has both federal and state aspects.

■ We pointed out the yardsticks for granting a preliminary injunction in the federal courts in *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975):

In measuring the district court's consideration of appellants' motions for preliminary injunctive relief, we recognize that the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. [Citations] Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*See also Delaware River Port Auth. v. Transamerican Trailer Transp.,* 501 F.2d 917 (3d Cir. 1974). On reviewing an order granting a preliminary injunction we must reverse if the district court has abused its discretion as determined by the criteria enunciated in *Oburn,* committed error of law, or made a clear mistake in the consideration of the proof. *Oburn, supra* 521 F.2d at 147, *citing Nat'l Land & Investment Co. v. Specter,* 428 F.2d 91, 95 (3d Cir. 1970).

Our review of the order granting the preliminary injunction in the instant case need proceed no further than the first of the four *Oburn* criteria—that plaintiffs show a reasonable probability of eventual success in the litigation. Since the plaintiffs' success is to be determined under New Jersey law, the first requisite to sustain the order is that plaintiffs have shown a reasonable probability of eventual success in making out their cause of action under the applicable law of that state. More specifically, plaintiffs must have shown a reasonable probability that they will be able eventually to meet their burden of proving publication, falsity, malice, and special damages.

■ Plaintiffs, however, have made no such showing. Publication, of course, has been amply proved, but for reasons we discuss hereafter, we believe plaintiffs have

---

11. The applicability of section 623A to product disparagement is made explicit by section 626:

§ 626. *Disparagement of Quality*

The rules as to liability for the publication of injurious falsehood stated in § 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things, which the publisher should recognize as likely to affect the conduct of a third person in respect to interests in such property.

not shown a reasonable probability that they will be able to prove falsity by a preponderance of the evidence or that they will be able to prove special damages. Viewed from another angle, we might say that the plaintiffs' failure in these two elements flowed from the commission of errors of law on the issues of falsity and special damages. Either way, the order of the district court must be reversed. *Oburn v. Shapp, supra* 521 F.2d at 147. We will discuss each issue in turn.[12]

### (1) Falsity of the Disparaging Communications

██ In allocating the burden of proof on the issue of falsity, the district court reached a result contrary to the law of New Jersey. The district court opined that "[a]s a matter of policy in the disparagement of quality cases, it would appear eminently fair and reasonable to place the burden of proving the truth of the disparaging statement upon the speaker." 414 F.Supp. at 760. A federal court's independent determination of policy is quite irrelevant, however, if it is inconsistent with the state law which the court is obliged to apply.

██ The one New Jersey case on point, *Andrew v. Deshler, supra,* strongly implies that a New Jersey court would place the burden of proving the falsity of the disparaging communication on the plaintiff rather than placing the burden of proving the truth on the defendant. Even if there were

no New Jersey case on point, we would be inclined to assume that a New Jersey court would follow the apparently unanimous view of other jurisdictions that the plaintiff in a product disparagement action must bear the burden of proving the falsity of the disparaging communications. *See, e. g.,* Restatement (Second) of Torts § 651(1)(c) (Tentative Draft No. 13, 1967); W. Prosser, Law of Torts § 128 at 919–20 (4th ed. 1971);[13] Note, *supra* note 2, 75 Colum.L. Rev. at 969 n. 29. We conclude, therefore, that the district court erred as a matter of law when it relieved the plaintiffs from the weighty burden of proving the falsity of the disparaging communications.

This conclusion, however, does not end our inquiry into the burden of proof issue. System maintains that even if we assume *arguendo* that the district court did misallocate the burden of proof, the error was harmless. In essence, System argues that the proof which it in fact adduced would have been more than sufficient to meet the burden, had it been charged with that obligation. This argument ignores the reality that the district court's findings of falsity in certain disparaging statements were in substantial measure a product of the court's decision to place the burden of proof on the defendant instead of on the plaintiffs. Indeed, the very first sentence of the court's discussion on the issue of truth or falsity bespeaks an express reliance on its erroneous conclusion as to the burden of proof:

12. The district court's determination on the issue of common law malice, 414 F.Supp. at 759, has not been questioned on appeal and we will not review it at this time. This is not to be confused with the issue whether defendants are protected by a constitutional privilege which can be overcome only upon a showing of "malice" in the sense that the term is used in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This latter issue was pressed on appeal but we find it unnecessary to reach it. *See* Part V, *infra.*

13. The district court discovered what it thought to be a conflict in Prosser's discussion of the burden of proof. 414 F.Supp. at 759. A close reading of the passage, which the district court interpreted as a suggestion that the defendant rather than the plaintiff might bear the burden of proof, W. Prosser, *supra* note 3, at 925, reveals that Prosser at that point is speaking to

the role of privilege. As a practical matter, Prosser states, one who disparages a competitor's goods cannot find protection behind the shield of privilege; he must be prepared to defend the truth of his remarks. The passage cannot be read as stating a rule that the defendant bears the burden of proof. Indeed, where Prosser does deal with the burden of proof he is unequivocal:

> But the plaintiff must plead and prove not only the publication and its accompanying innuendo, as in defamation, but something more. There is no presumption, as in the case of personal slander, that the disparaging statement is false, and the plaintiff must establish its falsity as part of his cause of action.

*Id.* at 920.

"*In view of the foregoing discussion [as to burden of proof]* and an evaluation of the facts, this Court concludes that the defendant, Scientific Games, . . . made false and disparaging statements about plaintiffs' instant lottery ticket . . . ." 414 F.Supp. at 761 (emphasis supplied). The discussion of the individual disparaging statements stresses that they had *not* been proven true rather than that they *had* been proven false:

> The statement to the Omaha lottery director regarding the New Jersey State Police finding *was never proven to be true.*
>
> \* \* \* \* \* \*
>
> *[I]t was never proven* that plaintiffs' Delaware and Omaha lottery tickets were insecure.

*Id.* (emphasis supplied). The only finding by the district court that a statement had been affirmatively proven false is that

> Statements to the effect that ticket agents in Omaha were "ripping off" the public by breaking the ticket were clearly false, for plaintiff established that there were no problems with the Omaha [ticket].

*Id.* This one finding does seem unequivocal but it, like the others, follows an express reference to the erroneous conclusion that defendants bore the burden of proof.

■ The district court's opinion thus contains at most a single affirmative finding that one of the defendant's statements had been proven false and we do not consider it sufficient to justify System's characterization of the misallocation of the burden of proof as harmless. Furthermore, the conclusion is inescapable that plaintiffs have not shown a reasonable probability that in a full-scale trial on the merits they will meet their burden of proving the falsity of the disparaging statements of which they complain.

**(2) Special Damages**

In reliance on *Black & Yates v. Mahogany Assn.*, 129 F.2d 227 (3d Cir.), *cert. denied*, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942), and *Edwin L. Weigand v. Harold E. Trent Co.*, 122 F.2d 920 (3d Cir. 1941), the district court held that "disparagement can be enjoined when a proper case is presented and . . . no special damages need be shown or alleged for such relief." 414 F.Supp. at 758. Reliance on these two cases was inappropriate and the resulting conclusion of law was erroneous.

We must reiterate that the question before us is whether System has shown a reasonable probability of eventual success in this litigation under the law of New Jersey. New Jersey law defines all the rights and liabilities of the parties including the question whether special damages need be shown or alleged. This is true both as to the action for damages, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and as to the prayer for permanent injunctive relief. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). *Black & Yates, supra*, is thus inapposite on two grounds: first, insofar as it holds that the availability of injunctive relief is to be determined by federal law without reference to the state rules of law which define the state-created right, *Black & Yates* was overruled by *Guaranty Trust, supra*, 326 U.S. at 108–09, 111–12, 65 S.Ct. 1464; [14] secondly, insofar as it was concerned with state law, *Black & Yates*, dealt with the law of Delaware, not the law of the State of New Jersey. As *Weigand, supra*, contains no more than a conclusory repetition of the holding of *Black & Yates* without citation to additional authority, its relevance can be no greater than that of *Black & Yates* on which it reposes.

■ The relevant law, we believe, is found not in *Black & Yates* and *Weigand* but in the New Jersey cases, specifically

---

14. With respect to the continuing vitality of *Black & Yates, see* the criticism of it in *Nowell v. Nowell*, 296 F.Supp. 640, 650 n. 34 (D.Mass.), *aff'd*, 417 F.2d 902 (1st Cir. 1969), and 11 Wright and Miller, *Federal Practice and Procedure*, § 2943 at 387–89 (1973).

*Henry v. Vaccaro Const. Co. v. A. J. De-Pace, Inc.*, 137 N.J.Super. 512, 349 A.2d 570, 573 (1975):

> As recognized by Prosser, the instant action is "only loosely allied to defamation," being rather an action on the case for special damages flowing from the interference to business. *Prosser, Torts* (4 ed. 1971), § 128 at 915. The action requires special damage in all cases, unlike ordinary defamation.

*See also Andrew v. Deshler, supra.* We therefore hold that under New Jersey law, disparagement of a product cannot be enjoined unless the plaintiff proves special damage. The district court, in the case *sub judice*, however, believing the existence of special damage to be irrelevant, made no finding that System had suffered special damages and it thus cannot be said that System has shown a reasonable probability of eventual success in proving this essential element of its claim.

### C. *Unfair Competition*

We have concluded above that the district court order granting a preliminary injunction must be reversed because plaintiffs have failed to show a reasonable probability of eventual success on their cause of action for product disparagement. We must now consider whether the injunction can be sustained on another theory.[15] Without conceding that the preliminary injunction cannot be upheld on a theory of product disparagement, System contends that we should evaluate the injunction under the law of unfair competition as well as under the law of product disparagement. According to

the law of unfair competition, System assures us, its probable eventual success in this litigation has been amply shown. Whether or not that assertion is correct, however, we cannot at this stage apply the law of unfair competition to this case for System's discovery of the unfair competition theory has come too late.

■ In its complaint, System set forth its second cause of action—the only cause of action relevant to this appeal—under the following heading:

> Common Law Disparagement of Product and Interference With Contractual Relations [16]

At the hearing in the district court, so far as the record shows,[17] both the parties and the court proceeded on the understanding that this action was one for product disparagement and interference with contractual relations only.[18] The district court's discussion of the law begins with the statement that "[t]he plaintiffs' complaint alleges disparagement of their product by the defendant," 414 F.Supp. at 757, and the entire opinion turns on a resolution of the product disparagement claim; the unfair competition claim nowhere rears its head.

Even if it were meritorious—and we pass no judgment on it—System may not now raise an entirely new theory in this court. *Cf. United States v. An Article of Drugs, etc.*, 320 F.2d 564 (3d Cir.), *cert. denied*, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963); *Granite City Steel Co. v. Koppers Co.*, 419 F.2d 1289, 1290 (7th Cir. 1969); 3 Moore's Federal Practice ¶ 15.13[2] at 992 (2d ed. 1974). The advancement of such a

---

**15.** In its brief, System argues that the injunction can be sustained on a theory of interference with contractual relations. The district court expressly held that plaintiffs had no right to relief on that theory, however, and System has filed no cross-appeal from that determination. Accordingly, we may not consider it.

**16.** As to the cause of action for interference with contractual relations, *see* note 15, *supra.*

**17.** Counsel for System advised us at oral argument that both Scientific and the district court were informed by System's prehearing memorandum of law that System wished to proceed on an unfair competition theory as well as a

product disparagement theory. Scientific, however, vehemently disclaimed any such understanding and as we read the district court opinion, the court gave no consideration to the unfair competition theory either. In any event, we cannot take into account the memorandum of law on which System now relies since it was not made part of the record in the court below or on appeal. We may consider matters of record only. *Landy v. FDIC*, 486 F.2d 139, 150 (3d Cir. 1973); *Jaconski v. Avisun*, 359 F.2d 931, 936 n. 11 (3d Cir. 1966).

**18.** *See* note 15 *supra.*

theory at this late date in this court would greatly prejudice the defendant Scientific. The gist of System's unfair competition theory is that the timing and manner of Scientific's disparaging statements was such as to make the statements "unfair" and tortious. System believes that on this theory, the statements by Scientific are actionable even if true and even if they caused no special damages. This theory is obviously radically different from the product disparagement theory and might well call for a different defense strategy.

In the belief that they had to defend against a product disparagement claim only, Scientific and Dittler may well have structured their defense on the realization that they would escape all liability if System failed to prove either the falsity of the disparaging communications or any consequential special damage. Evidence relevant to the fairness or unfairness of the manner and timing of the statements was completely irrelevant to the product disparagement claim and Scientific or Dittler would have had no purpose in presenting it to the court. We cannot now fault the defendants for failing to prove something which they had no need to prove nor for not contesting something which they had no need to contest. A defendant is not obligated to analyze the facts pleaded against him for the purpose of conjuring up every possible cause of action which might be asserted against him, and then to defend simultaneously against such straw men on pain of being overcome at the appellate level on a cause of action which the plaintiff had theretofore never pressed. Accordingly, we will not now consider whether System is entitled to any relief on a theory of unfair competition. This does not preclude System from pursuing that cause of action in an appropriate manner in any further proceedings in this case in the district court, subject, of course, to Scientific's right of defense.

## IV.

The district court failed to require that System post a security bond in support of the preliminary injunction awarded to it. In so doing, the district court committed an error of law which constitutes an independent ground for reversal. An award of a preliminary injunction without requiring a bond by the plaintiff violates Rule 65(c) of the Federal Rules of Civil Procedure which provides in pertinent part:

> *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

System contends that although the language of Rule 65(c) appears mandatory, the requirement of a security bond is actually within the discretion of the district court. In support of its argument, System cites *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780 (9th Cir. 1964), and *Powelton Civic Home Owners v. HUD*, 284 F.Supp. 809 (E.D.Pa.1968), but neither case is on point. *Powelton* holds that a party who has not been enjoined has no right to demand that another party post a security bond. In the instant case, of course, Scientific and Dittler have both been enjoined. *Continental Oil* holds that the requirement for a bond may be waived by the district court where the grant of the injunction carries no risk of monetary loss to the defendant. In the case *sub judice*, the injunction restricts the defendants in their efforts to win new instant lottery ticket contracts and the potential for monetary loss is indeed substantial.

We hold that in these circumstances a district court commits reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction.[19] *See, e. g.,*

19. Inasmuch as we must reverse the award of the preliminary injunction for reasons other than the failure to post an injunction bond, we need not consider whether at this stage a re- mand to the district court with directions to stay the preliminary injunction pending the posting of the bond would satisfy the requirements of Rule 65(c).

*Telex Corp. v. IBM Corp.*, 464 F.2d 1025 (8th Cir. 1972); *Pioche Mines Consol., Inc. v. Dolman*, 333 F.2d 257 (9th Cir. 1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1081, 13 L.Ed.2d 972 (1965); *Chatz v. Freeman*, 204 F.2d 764 (7th Cir. 1953); *cf. Hopkins v. Wallin*, 179 F.2d 136 (3d Cir. 1949). We do not decide whether a court may dispense with the posting of a bond in a case where the injunction raises no risk of monetary harm to the defendant. *See, e. g., Continental Oil, supra; Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Brookins v. Bonnell*, 362 F.Supp. 379 (E.D.Pa.1973).

## V.

Because we reverse the district court's order on principles of New Jersey common law and for failure to comply with Rule 65(c) of the Federal Rules of Civil Procedure, we need not reach the several other interesting issues raised by the appellants: Did the grant of the injunction violate the equitable doctrine of clean hands? Does a preliminary injunction against a competitor's product disparagement necessarily violate the constitutional prohibition against prior restraints on speech? Does the constitution require that a plaintiff in a product disparagement action prove "actual malice" on the part of the defendant within the meaning of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)? Defendants will of course have an opportunity to pursue these and other contentions as the litigation progresses in the district court.

## VI.

The order of the district court granting a preliminary injunction against defendants Scientific Games and Dittler Brothers will be reversed, the injunction ordered dissolved, and the case will be remanded to the district court for further proceedings not inconsistent with this opinion.