**WHETSTONE CANDY CO., INC., Plaintiff**

v.

**NATIONAL CONSUMERS LEAGUE, Defendant.**

**No. 02–707 (RJL).**

United States District Court, District of Columbia.

March 5, 2004.

---

Patrick Joseph Smith, Patrick J. Smith & Associates, Rockville, MD, Robert L. McLeod, St. Augustine, FL, for Plaintiff.

Lee Ellen Helfrich, Martin Lobel, Lobel, Novins & Lamont, Washington, DC, Reed W. Grimm, Rhonda B. Boggess, Steven E. Day, Taylor, Day & Currie, Charles Cook Howell, III, Howell & O'Neal, Jacksonville, FL, for Defendants.

### ORDER

LEON, District Judge.

This case arises from a claim of injurious falsehood and tortious interference with business relations by Whetstone Candy Company ("Whetstone") against the National Consumers League ("NCL"), a non-profit consumer group, based in Washington, D.C., whose stated mission includes "informing the public about potential health and safety hazards of a variety of consumer products and advocating legislative and regulatory actions that enhance the safety of consumer products."[1] Def.'s Stmt. of Undisputed Facts ¶ 1. Whetstone claims that NCL caused to be published a series of defamatory statements about the safety of a candy egg produced by Whetstone, and that as a result, Whetstone suffered pecuniary damages. Before the Court is NCL's Motion for Summary Judgment claiming, *inter alia*, that Whetstone has failed to produce any evidence of damages resulting from NCL's statements. For the reasons stated below, the Court

---

1. NCL's operating funds are obtained through donations from grants, sponsorships, and individual and corporate donations.

GRANTS NCL's motion and enters judgment for the defendant on both claims.

## BACKGROUND

Whetstone is a chocolate and candy manufacturer based in St. Augustine, Florida. In early 2000, Whetstone began production of Megga Surprize, a "children's surprise egg" that consists of a plastic egg covered by two chocolate hemispheres that fall away when the product is unwrapped. Pl.'s Opp. to Mot. for Summ. J., Ex. 11 at 2; Ex. 9. The plastic egg contains a paper toy and has a ridge that runs longitudinally, separating the two chocolate hemispheres. Def.'s Mot. for Summ. J., Ex. 9.

In a letter dated June 19, 2000, the Food and Drug Administration ("FDA") informed Whetstone that it had become aware of Whetstone's intention to market Megga Surprize. Def.'s Mot. for Summ. J., Ex. 9. The FDA further notified Whetstone that Megga Surprize potentially qualified as an "adulterated" food under section 402(d)(1) of the Federal Food Drug and Cosmetic Act and that Whetstone was required to petition the FDA for authorization to market a "confectionary in which a non-nutritive object is partially or completely embedded." The letter indicated that past petitions for such products had been unsuccessful[2] and that the FDA was aware of reports of injury and death in children "as a result of toys enclosed in chocolate eggs marketed in Europe." The FDA requested a reply from Whetstone within 30 days and noted that the U.S. Consumer Product Safety Commission ("CPSC") also has jurisdiction over plastic eggs and small toys. In a subsequent letter, dated December 8, 2000, the FDA indicated that further analysis of Megga Surprize had led it to the conclusion that Megga Surprize, in its current form, did not violate section 402(d)(1) and that specific authorization was unnecessary at that time. Pl.'s Opp. to Mot. for Summ. J., Ex. 9.

On approximately April 8, 2001, NCL received a report prepared by Safety Behavior Analysis, Inc. titled Choking Hazard Evaluation of Megga Surprize. Def.'s Mot. for Summ. J., Ex. 27. The report was prepared by Shelley Waters Deppa, the President of Safety Behavior Analysis and a Certified Human Factors Professional, at the request of the law firm Hogan & Hartson.[3] Pl.'s Opp. to Mot. for Summ. J., Ex. 25 at 87–93, 113–116, 120–125. The report concluded that, despite technical compliance with choking hazard test fixtures, Megga Surprize nonetheless posed "a serious choking hazard to children due to its size, shape, consistency, and intended age group." Pl.'s Opp. to

**2.** Two relevant products had been previously rejected by the FDA as "adulterated" under section 402(d)(1). According to Whetstone's website, Ferrero's Kinder Surprise, which is sold in Europe, is a hollow chocolate egg containing a toy for children ages 3 and over inside of a small sphere. Ferrero applied for, and was denied, FDA permission to sell Kinder Surprise in the U.S. In 1996, Whetstone contracted to manufacture Nestle Magic—which was very similar to Kinder Surprise—and production began in 1997. Later that year, Nestle pulled Magic from the market after the FDA determined that it was in violation of section 402(d)(1). Pl.'s Opp. to Mot. for Summ. J., Ex 11. This decision came in the wake of opposition from consumer groups and state attorneys general concerned about the safety of the product. Def.'s Mot. for Summ. J. ¶ 24; Pl.'s Opp. to Mot. for Summ. J. at 10.

**3.** Hogan & Hartson's client, if there was one, was not revealed. This issue was the subject of a motion to compel by Whetstone and a motion for a protective order by Hogan & Hartson. For the purposes of this opinion, and for reasons explained more fully below, the Court concludes that the identity of the client, if one exists, is not relevant to any material issue in this case.

Mot. for Summ. J., Ex. 3 at 7. When Golodner received the report, she gave it to Brett Kay, the director for food and health policy, to review it and make a recommendation as to whether it "warranted further action." Pl.'s Opp. to Mot. for Summ. J., Ex. 18 at 26. Kay concluded that Megga Surprize "presented a choking hazard, and [ ] that it was National Consumer League's duty to publicize it." Id.

After consultation with Golodner, Kay drafted a petition letter to the CSPC urging them to "analyze Megga Surprize and, if appropriate, take immediate enforcement action to protect small children." Pl.'s Opp. to Mot. for Summ. J., Ex. 2 at 2. On approximately April 12, 2001—a date shortly before Easter—the letter was sent to the CSPC.[4] The consumer group simultaneously issued a press release discussing the letter and "warning parents to keep this candy away from their children." Pl.'s Opp. to Mot. for Summ. J., Ex. 1 at 1. The press release was sent through PR Newswire and faxed to major media outlets. It was also made available on NCL's website. Def.'s Stmt. of Undisputed Facts ¶ 51.

The press release contained various statements and assertions that Whetstone alleges were false and defamatory, including: (1) the assertion that Megga Surprize poses a choking hazard; (2) "[b]ecause of its size, shape, color, and smell, this plastic egg will undoubtedly end up in children's mouths—with potentially deadly consequences"; (3) "[i]t is a recipe for tragedy"; (4) the assertion that the plastic egg has an "effective maximum diameter" of 1.58 inches; (5) the reference to "choking incidents involving objects of similar size and shape"; (6) the assertion that the ridge is "unlikely to be effective in preventing the

object from sliding from the mouth into the back of the throat and obstructing the airway"; and (7) the statement that "[w]e don't want any more children to die needlessly when a tragedy can be prevented". Compl. ¶ 15. Whetstone further complains that the letter to the CSPC contained some of the same allegedly defamatory statements as the press release (i.e. the assertions regarding the effective diameter of the egg and the effectiveness of the ridge), as well as the additional statement that Megga Surprize "is cleverly designed to evade CPSC and Food and Drug Administration restrictions" and an alleged implication that there have been reported choking incidents involving Megga Surprize. Compl. ¶ 19.

Various news outlets, including the Florida Times–Union and the Washington Post, published stories on the safety of Megga Surprize. Def.'s Mot. for Summ. J., Ex. 13, 14; Compl. ¶ 14. The Washington Post article on April 13, 2001, however, quotes Ann Brown, the Chairman of the CPSC, as saying that the CPSC would not take any action against Megga Surprize because it met federal safety standards. The article also quoted Hank Whetstone ("Mr. Whetstone"), chief executive of Whetstone Candy Company, saying that the criticism was unfair and that it was part of "a carefully orchestrated campaign" by competitors to damage his company. Def.'s Mot. for Summ. J., Ex. 13.

Whetstone alleges that, as a result of NCL's intentional and unjustifiable interference with Whetstone's business relations, Whetstone lost customers and sales of Megga Surprize declined. Compl. ¶¶ 28, 29, 31,33, 34.

---

4. The letter was signed by the president of NCL and the assistant director of the Consumer Federation of America ("CFA"). CFA was originally a co-defendant sued in this action but was dismissed from the action on March 26, 2003. For purposes of this opinion, the facts related to CFA have been omitted.

## STANDARD OF REVIEW

Summary judgment is appropriate under Federal Rule 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). The moving party bears the initial burden of identifying the basis of its motion and the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits which is believes demonstrate the absence of material fact. *See Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. To determine which facts are material, the Court must examine the substantive law underlying the claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense, thereby affecting the outcome of the action. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Additionally, to be genuine, the issue of fact must be supported by sufficient admissible evidence such that a reasonable trier of fact could find for the non-moving party. *See Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987). An adverse party's or non-moving party's mere allegations or denials are insufficient to defeat an otherwise proper motion for summary judgment. Instead, the non-moving party must present, by affidavits or otherwise, specific facts that demonstrate there is a genuine issue for trial. *See id.* at 1248–49. At all times, the Court must construe all evidence presented in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## ANALYSIS

 Whetstone seeks recovery on two separate tort theories—injurious falsehood and tortious interference with business relations—based on NCL's dissemination of its press release and its letter to the CPSC. Liability for a claim for injurious falsehood [5] requires proof that (1) defendant's unprivileged publication of false statements concerning plaintiff's property or product, (2) with knowledge or reckless disregard of the falsity that the defendant, (3) was the proximate cause of pecuniary harm to the plaintiff. *See Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1155 n. 6 (D.C.Cir.1985) (*Golden Palace, Inc. v. National Broadcasting Co.,* 386 F.Supp. 107, 109 (D.D.C.1974), *aff'd without opinion,* 530 F.2d 1094 (D.C.Cir.1976); *System Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1141 (3d Cir.1977)). A claim for tortious interference with business relations requires proof of four elements: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and (4) resultant damage." *Bennett Enters., Inc. v. Domino's Pizza, Inc.,* 45 F.3d 493, 499 (D.C.Cir.1995) (citing *Genetic Sys. Corp. v. Abbott Labs.,* 691 F.Supp. 407, 422–23

---

5. "Injurious falsehood" is generally used to describe a group of torts also known as disparagement of property, slander of title or trade libel. It is closely related to traditional libel and slander except that the injury is not to personal reputation, but rather to the plaintiff's interest in, or the quality of, the plaintiff's property. *See Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1155 n. 6 (D.C.Cir.1985) (citing Restatement (Second) of Torts § 623A comment a (1977)).

(D.D.C.1988); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284 (D.C.App.1977)).

To survive a motion for summary judgment, Whetstone must provide sufficient evidence of the elements underlying its claim that a reasonable juror could find in its favor. Assuming for summary judgement purposes that the statements contained in the press release and letter were false and that NCL possessed the requisite mental state with respect to each of the torts alleged, Whetstone must nonetheless show that there exists actual damages which resulted from the defendant's conduct. A careful review of the evidence adduced during discovery in this case demonstrates that Whetstone has merely put forward conclusory statements unsupported by specific facts as to the nature and extent of damages that it alleges were caused by the defendant's statements Thus, for the following reasons, the Court concludes that a reasonable juror would be unable to find that Whetstone suffered any damages as a result of NCL's actions.

Whetstone's complaint alleges that, as a result of NCL's publication of false statements about Megga Surprize, Whetstone suffered "pecuniary losses resulting from the impairment of the vendability of 'Megga Surprize'" and "special damages as a result of lost sales, lost market and lost customer base." (Compl.¶¶ 28, 29.) Whetstone also alleges that as a result of NCL's intentional and unjustified interference with Whetstone's business relationships, it "experienced a loss of existing and prospective customers" causing "diminished revenues and other pecuniary damages." (Compl.¶¶ 33,34.)

As its sole evidence of a genuine issue of damages, Whetstone relies on the declaration of Mr. Whetstone, chief executive officer and principal owner of Whetstone Candy Company. (Pl.'s Opp. to Mot. for Summ. J. at 17; Ex. 26.) The declaration's only testamentary reference to damages, however, touches very briefly on that topic:

> "These defamatory statements occurred right before Easter and greatly affected our sale of the product. One of our largest customers, the 7–11 Corporation, failed to reorder the product, citing slow sales and, we engaged no interest from the other vendors and markets as a direct result of this public and national defamation of this product."

Pl.'s Opp. to Mot. for Summ., Ex. 26 at 4. Indeed, the declaration neither refers to, nor cites, any specific evidence of actual damages or any evidence linking "slow sales" or lack of interest to NCL's press release or letter.[6] While Whetstone's pleading avers that Whetstone lost the development costs associated with Megga Surprize as a result of NCL's conduct, it fails to provide any evidence proving that assertion. In short, mere assertions, not testamentary evidence, has been offered in

6. Mr. Whetstone testified in a deposition taken by the defendants that "probably half a dozen to a dozen" merchants expressed concern as a result of the "controversy." Id. at 116. However, there is no evidence, aside from that assertion, that any vendor or consumer refused to purchase Megga Surprize because of NCL's statements. Mr. Whetstone was unable to identify any of the vendors who expressed concern to him, the amount of lost sales, or the size of Megga Surprize's customer base. In certain instances, he indicated that Mr. Fox, one of his employees, "would probably be more knowledgeable" about damages. Id. at 125. No declaration or testimony by Mr. Fox was offered by either party. Mr. Whetstone further testified that M & M Mars breached a contract with Whetstone as a result of NCL's statements. Id. at 131. But again, no specific evidence was offered as to the existence of or breach of a contract, and none was offered as to the causal connection, if any, between the two events.

support of Whetstone's claim for damages.[7]

Similarly, the only documentary evidence relating to damages in the record was a 2001 sales forecast prepared by one of Whetstone's employees that was introduced at Mr. Whetstone's deposition.[8] Def.'s Mot. for Summ. J., Ex 7 at 162. Mr. Whetstone's assertion on that occasion that the 2001 forecast exceeded actual sales by "at least an order of magnitude of 50 percent," however, is of little evidentiary value in light of the fact that the 2000 forecast also exceeded actual sales that year by "at least 50 percent." *Id.* at 164. Moreover, these sales forecasts were not in the record, nor were declarations by the employees who prepared them, or relevant expert reports.

To the extent actual sales amounts were discussed during Mr. Whetstone's deposition, those, by contrast, strongly suggest no resulting harm to Whetstone after the NCL involvement. In particular, from April 2000 to April 2001—the year preceding NCL's involvement—sales of Mega Surprize totaled $295,616. Whereas, from April 2001 to November 2001—from the time of NCL's involvement until Megga Surprize was taken off the market—sales topped $250,000. *Id.* at 50–51. On an annualized basis, these figures represent an *increase* in Whetstone's sales. Accordingly, Whetstone's theory that sales did not increase as quickly as they would have if NCL had not circulated false statements about the product, is simply not borne out by the evidence.

In determining whether there exists a genuine issue of material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202; see also Washington Post Co. v. U.S. Dep't. of Health and Human Servs., 865 F.2d 320, 325 (D.C.Cir. 1989). However, the nonmovant may not rely on conclusory allegations, but must present supporting facts from which a reasonable juror could find in the nonmovant's favor. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999) ("Accepting such conclusory allegations as true ... would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."). Simply stated, Whetstone has failed to offer any evidence to support its

7. The Court need not address Whetstone's motion to compel testimony from Shelly Waters Deppa and Richard Frank. Whetstone sought their testimony to discover who was ultimately behind the creation of the Deppa Report as evidence that the report was not credible. For purposes of this opinion, the Court assumes that NCL's statements were false and defamatory, making their testimony unnecessary. Indeed, Whetstone argues that any ruling on the motion for summary judgment is premature because discovery has not been completed. However, the only outstanding discovery is the subject of the motion to compel and the testimony sought would not be relevant to the Court's inquiry in this opinion—damages and causation. Therefore, the plaintiff is not prejudiced by the timing of this ruling.

8. In its statement of disputed facts, Whetstone states that "Whetstone has suffered damages, contrary to NCL's assertions, as set forth in [Mr.] Whetstone's supportive affidavit." Whetstone, however, did not specifically object to or offer any evidence contrary to any of the detailed factual allegations regarding actual sales figures and the lack of documentation as to causation in paragraphs 75 through 81 of NCL's Statement of Undisputed Facts. Moreover, Whetstone did not offer a reason or explanation why such information, which should be in its control, was somehow unavailable or irrelevant. Pursuant to LcvR 7(h), the Court assumes that these factual allegations are admitted since they remain uncontroverted by Whetstone's pleading and were, after all, based upon Mr. Whetstone's own testimony.

allegations of damages. Under these circumstances, a reasonable juror could not conclude that NCL's statements were the proximate cause of pecuniary harm to Whetstone. Accordingly, NCL's motion for summary judgement should be GRANTED.

## CONCLUSION

For the reasons set forth above, the Court hereby

**GRANTS** defendant's motion for summary judgment; and

**ORDERS** that judgment be entered for the defendant and plaintiffs complaint be dismissed with prejudice.

**SO ORDERED.**